UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EUGENE NEWELL,

                              Plaintiff,

              -against-

CAROLYN W. COLVIN, Acting Commissioner
of Social Security

                              Defendant.

---

15cv07095 (PKC) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE P. KEVIN CASTEL, U.S.D.J.:**

Plaintiff Eugene Newell ("Plaintiff") seeks review of the final decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental Security Income ("SSI") and disability insurance ("SSDI") benefits under the Social Security Act (the "Act"), on the ground that Plaintiff's impairments did not constitute a disability for purposes of the Act. Currently before this Court for a report and recommendation are Defendant's motion, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings affirming the Commissioner's decision (Dkt. 15), and Plaintiff's cross-motion for judgment on the pleadings reversing the Commissioner's decision, or, in the alternative, remanding the matter for a new hearing (Dkt. 19).

For the reasons set forth below, I respectfully recommend that Defendant's motion be denied and Plaintiff's cross-motion be granted, and that this case be remanded solely for the calculation and payment of benefits to Plaintiff from his alleged disability onset date of December 31, 2007.

# BACKGROUND[1]

Plaintiff filed applications for SSI and SSDI benefits on March 27, 2009.  (R. at 135, 142, 152.)  In both applications, Plaintiff alleged disability as of December 31, 2007, due to mental health issues, including depression, and chronic back, neck, and leg pain.  (*Id.* at 176, 187.)  After a lengthy procedural history – including three hearings before two administrative law judges and a stipulated remand back to the Social Security Administration ("SSA") from this Court – Administrative Law Judge ("ALJ") Robert Gonzalez issued a decision on May 28, 2015, denying Plaintiff's applications.  (*Id.* at 424-25.)  As set out in his decision, ALJ Gonzalez determined that, despite the fact that Plaintiff had certain severe impairments, Plaintiff was nonetheless able to work at jobs existing in significant numbers in the national economy, and, therefore, was not disabled for the purposes of the Act.  (*Id.*)  The decision was apparently affirmed by the Social Security Appeals Council, and thereafter became the final decision of the Commissioner.[2]  Plaintiff now challenges the Commissioner's denial of benefits.

## A.    **Plaintiff's Personal and Employment History**

Plaintiff was born on December 14, 1961, and was 47 years old at the time that he filed his applications.  (*Id.* at 135.)  He lives in Newbergh, New York, has never been married, and has

---

[1] The background facts set forth herein are taken from the Social Security Administration Administrative Record (Dkt. 12) (referred to herein as "R." or the "Record").

[2] Neither party has identified any Appeals Council action as to ALJ Gonzalez's May 28, 2015 decision, nor has this Court identified any such action in the Record.  Regardless, the Commissioner admitted in her Answer to Plaintiff's Complaint that Plaintiff's current action before this Court is, in fact, "an appeal from a final administrative decision denying Plaintiff's claim."  (*Compare* Complaint, dated Sept. 9, 2015 ("Compl.") (Dkt. 1) ¶ 2 *with* Answer, dated Dec. 17, 2015 ("Answer") (Dkt. 11) ¶ 2.)  As the Commissioner has not otherwise raised the defense that Plaintiff has failed to exhaust his administrative remedies, and, as such a defense is waivable where, as here, the plaintiff has presented his benefits claim to the SSA, *Escalera v. Comm'r of Soc. Sec.*, 457 F. App'x 4, 5 (2d Cir. 2011), the Court's jurisdiction over this action is proper under 42 U.S.C. § 405(g).

no children.  (*Id.* at 4-5, 136, 486.)  He began taking special education classes in the third grade,

and was awarded an Individualized Education Plan ("IEP") Diploma in 1981 after completing

the 12th grade.[3]  (*Id.* at 19-20, 34-35, 149-50, 1127.)  He reported first being able to write his

name in the sixth or seventh grade.  (*Id.* at 1127.)

   Plaintiff was determined to be disabled by the SSA from April 1981 to June 1988.  (*Id.*

at 152.)  The reason for that disability determination is not included in the Record.  When

questioned as to why he was under a disability between those dates, Plaintiff testified that he

believed that his mother applied for disability benefits on his behalf because he had attended

special education classes.  (*Id.* at 19.)  He admitted, however, that he was actually "not too sure"

of the reason.  (*Id.*)

   From 1985 to 1999, Plaintiff worked as a cashier, stock person, and fork-lift operator at

the Bradlees department store.  (*Id.* at 167, 170.)  He then worked as a cashier and shelf-stocker

at Spear Brothers Lumber, a hardware store, from November 2000 to December 2006.  (*Id.* at

167, 169, 479-82.)  After leaving that job, Plaintiff worked as a cashier and deep fryer at Popeyes

Louisiana Kitchen, a fast food restaurant, from January 2007 to December 31, 2007.  (*Id.* at 167-

68, 176, 483-84.)  In an undated "Disability Report" that Plaintiff filed with the SSA, Plaintiff

indicated that he had stopped working at that time due to "mental issues" and because his "pain

was too much."  (*Id.* at 176.)  In testifying before ALJ Gonzalez, however, Plaintiff stated that he

had stopped working because his Popeyes location went out of business, and he needed to take

care of his mother, who had been diagnosed with cancer.  (*Id.* at 488.)  Plaintiff testified that his

mother passed away from cancer in January 2009.  (*Id.* at 20-21.)

---

   [3] As discussed below, IEP diplomas are issued to students with learning disabilities, and
are not equivalent to high school diplomas.  (*See* Discussion, at Section III(A).)

While Plaintiff has not actually been employed since December 31, 2007 (*id.* at 176, 490), at some point in 2013, he apparently began delivering pizzas, on occasion, for Napoli's Family Restaurant & Pizzeria ("Napoli's"), in exchange meals from the restaurant and tips from customers (*id.* at 513-25, 712-13, 1136).

In terms of his daily activities, Plaintiff reported preparing "T.V. dinners" for himself, shopping while riding an "electric cart," showering once a week, doing laundry irregularly, walking around his apartment, driving, "light vacuuming," watching television, listening to the radio, and socializing with friends and family.  (*Id.* at 158, 160, 166, 224, 227, 1125, 1138-39, 1147.)  He also stated that he cleans his apartment, but that sometimes, his landlord cleans it for him.  (*Id.* at 446.)

### B.    Medical Evidence

As Plaintiff reported that his disability began on December 31, 2007, the relevant period under review for Plaintiff's SSDI benefits runs from that date through December 31, 2013, the date that Plaintiff was last insured.  *See Swainbank v. Astrue*, 356 F. App'x 545, 547 (2d Cir. 2009) (citing *Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989)); *see also* 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.130, 404.315(a).[4]  The relevant period under review for Plaintiff's SSI benefits, however, runs from March 27, 2009, the date that Plaintiff applied for

---

[4] "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage,'" *i.e.*, quarters in which the applicant earned wages and paid taxes, "to total quarters." *Arnone*, 882 F.2d at 37-38.  To qualify for SSDI, an applicant must establish that he or she became disabled on or before the expiration of his or her insured status.  *Id.* at 38.  Here, it is undisputed that Plaintiff's last date of insured coverage was December 31, 2013.  (R. at 50, 152, 408-09; *see also* Dkt. 20 (Memorandum of Law in Support of Cross Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(c), dated Apr. 12, 2016 ("Pl. Mem.")), at 6.)

those benefits, through May 28, 2015, the date of the ALJ's decision.  *See Frye v. Astrue*, 485 F. App'x 484, 485 n.1 (2d Cir. 2012); *see also* 20 C.F.R. § 416.335.

The relevant medical evidence of record consists of treatment records and other information provided by Plaintiff's treating sources, reports of examinations conducted by a consulting psychologist, internist, and orthopedist, and opinion testimony and a report by two non-examining psychiatrists.  In total, the Record in this matter is 1,957 pages.

### 1.   Evidence Pre-Dating the Relevant Period

In July 2004, Plaintiff was injured in a motor vehicle accident.  (R. at 208.)  In November 2004, he visited New York Neurosurgical, complaining of neck pain and an episode in which he had felt "paralyzed" for a few minutes.  (*Id.*)  An MRI was taken, which revealed a herniated disc in Plaintiff's cervical spine.  (*Id.* at 209.)  Plaintiff underwent physical therapy and was not recommended for surgery.  (*Id.* at 210.)  In both September 2009 and January 2015, Plaintiff attributed his chronic back pain to this accident.  (*Id.* at 1173, 1952.)

### 2.   Evidence From the Alleged Disability Onset Date Through the Date of Plaintiff's Benefits Applications (Dec. 31, 2007 – Mar. 27, 2009)

Plaintiff has alleged a disability onset date of December 31, 2007, but has only pointed to one page of medical evidence in the 1,957-page Record from the year 2008.   (*See* Pl. Mem., at 6 (citing R. at 220).)  That one page of evidence is a progress note from the Horizon Family Medical Group ("Horizon"), dated October 30, 2008, indicating that Plaintiff had been diagnosed with depression and prescribed Zoloft.  (R. at 220.)  The only other piece of 2008 evidence that this Court has located in the Record is an April 2008 progress note from Horizon regarding Plaintiff's complaints of a headache, foot pain, congestion, and cough.  (*Id.* at 221.)  This lack of evidence appears to be the reason why Plaintiff's attorney stated at the September 24, 2010

hearing that, if the ALJ did not find that Plaintiff's impairments satisfied one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"), then the "appropriate onset date" in this case would be January 2009.  (*Id.* at 41-42.)

On January 5, 2009, Plaintiff was assessed with having anxiety and was prescribed Xanax.  (*Id.* at 218.)  On March 9, 2009, Plaintiff was assessed with suffering from a "grief reaction," and was referred for therapy.  (*Id.* at 215.)

> ### 3.    Evidence From the Date of Plaintiff's Benefits Applications Through Plaintiff's Date Last Insured (Mar. 27, 2009 – Dec. 31, 2013)

> #### a.    Consultative Psychiatric Evaluation (Leslie Helprin, Ph.D., May 21, 2009)

On May 21, 2009, psychologist Leslie Helprin, Ph.D., conducted a consultative psychiatric evaluation of Plaintiff for the purposes of Plaintiff's SSA disability claims.  (*Id.* at 222-25.)  Plaintiff informed Dr. Helprin that he was unable to work due to "depression and [an] adjustment disorder," apparently reporting a diagnosis he had received from a treating physician.  (*Id.*)

Upon conducting a mental status examination of Plaintiff, Dr. Helprin concluded that Plaintiff was "able to follow and understand simple directions and instructions and perform simple rote tasks and some complex tasks independently, limited by cognitive limitations."  (*Id.* at 224.)  He further concluded that Plaintiff was "able to maintain attention and concentration, maintain a regular schedule, make appropriate simple decisions, relate adequately with others, and deal appropriately with stress."  (*Id.* at 224.)  Although Dr. Helprin found that the results of his examination appeared to be consistent with "some secondary emotional difficulties," he did not find Plaintiff's limitations to be significant enough to interfere with his ability to function on a daily basis.  (*Id.*)  He diagnosed Plaintiff with an "[a]djustment disorder with depressed mood,

mild, episodic," and also noted his hypertension, carpal tunnel syndrome, and back and knee pain.  (*Id.* at 224-25.)  As to Plaintiff's cognitive functioning, Dr. Helprin noted that Plaintiff's "[i]ntellectual skills [were] in the borderline range and [his] general fund of information [was] somewhat limited."  (*Id.* at 224.)  Dr. Helprin recommended that Plaintiff continue taking antidepressants and commented that, if Plaintiff were found not to be disabled, he would "benefit from vocational assessment and training for a simple job."  (*Id.* at 225.)  Dr. Helprin concluded by noting that Plaintiff would "need assistance managing his funds due to his cognitive limitations."  (*Id.*)

### b.  Consultative Internal Medicine Examination (George Adams, M.D., May 21, 2009)

Also on May 21, 2009, internist George Adams, M.D., conducted a consultative internal medicine examination of Plaintiff for the purposes of Plaintiff's SSA disability claims.  (*Id.* at 226-30.)  According to Dr. Adams, Plaintiff arrived at the examination with a note signed by Ciro Attardo, M.D., from Horizon, dated May 9, 2009, indicating that Plaintiff had been under Dr. Attardos' care for general depression and adjustment disorder, and that Plaintiff had "a history of mental retardation."  (*Id.* at 226.)  During the examination, Plaintiff complained to Dr. Adams of depression, which had worsened upon the death of his mother.  (*Id.*)  He also complained of pain in both knees, leg numbness, carpal tunnel syndrome, and tingling, pain, and numbness in his fingers.  (*Id.* at 226-27.)

Dr. Adams conducted a physical examination of Plaintiff and observed that Plaintiff's gait was normal, that he could walk on heels and toes without difficulty, that he could complete a full squat, that he required no help changing for the examination or getting on or off the examination table, and that he was able to rise from a chair without difficulty.  (*Id.* at 227.)  Dr. Adams also noted that Plaintiff's cervical and lumbar spine showed "full flexion, extension,

lateral flexion bilaterally, and full rotary movement bilaterally," that Plaintiff had a full range of motion in his shoulders, elbows, forearms, wrists, hips, knees, and ankles, and that he had full strength in his upper and lower extremities. (*Id.* at 228.) Dr. Adams concluded that, based on "today's history and examination findings," Plaintiff had "no physical limitation." (*Id.* at 229.)

### c.   Consultative Psychiatric Evaluation (Z. Mata, Ph.D., June 3, 2009)

On June 3, 2009, Z. Mata, Ph.D., completed "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment" forms for Plaintiff. (*Id.* at 232-48.) According to ALJ Gonzalez, Dr. Mata is "a medical expert in psychology," who did not personally examine Plaintiff, but instead based his assessment "primarily [on] the May 2009 consultative examination findings" (*i.e.*, of Drs. Helprin and Adams). (*Id.* at 415-16.) In his Psychiatric Review Technique, Dr. Mata opined that Plaintiff suffered from an "adjustment disorder [with a] depressed mood" (*id.* at 235), mild restrictions on activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace (*id.* at 242). He also found that Plaintiff had never suffered from repeated episodes of "deterioration" of extended duration. (*Id.*) In his Mental Residual Functional Capacity Assessment, Dr. Mata opined that Plaintiff was "moderately limited" in his "ability to understand and remember detailed instructions," "carry out detailed instructions," and "set realistic goals or make plans independently of others," but was otherwise "not significantly limited" in various abilities related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id.* at 246-47.) In reviewing Plaintiff's medical records, Dr. Mata apparently found a note indicating that Plaintiff "may have mild mental retardation." (*Id.* at 248.) Dr. Mata stated that there was "no formal testing to v[e]rify" such a finding. (*Id.*) He ultimately concluded that Plaintiff "would be capable of performing at least simple work." (*Id.*)

### d.     Medical Source Statement (Physical) <br> (George Thompson, D.C., Aug. 7, 2009)

On August 7, 2009, Plaintiff's treating chiropractor, George Thompson, D.C., completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" form for Plaintiff.  (*Id.* at 254-59.)  Dr. Thompson reported that Plaintiff was "occasionally" able to lift and carry up to 20 pounds, but no more.  (*Id.* at 254.)  Dr. Thompson also specified that Plaintiff could only sit, stand, or walk for one hour at a time without interruption, and, with respect to each, for one hour total in an eight-hour work day.  (*Id.* at 255.)  Dr. Thompson also wrote on the form that Plaintiff could only "occasionally" reach, handle, finger, feel, push, and pull with either hand, and only "occasionally" operate foot controls.  (*Id.* at 256.)  As to Plaintiff's postural activities, Dr. Thompson stated that Plaintiff could "never" balance or climb ladders or scaffolds, but could "occasionally" climb stairs and ramps, stoop, kneel, crouch, and crawl.  (*Id.* at 257.)  In terms of environmental limitations, Dr. Thompson opined that Plaintiff could "never" tolerate unprotected heights or moving mechanical parts, "occasionally" tolerate humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, and vibrations, and "frequently" tolerate operating a motor vehicle and extreme heat.  (*Id.* at 258.)  Additionally, Dr. Thompson reported that Plaintiff could not travel without a companion for assistance or use standard public transportation, but was able to shop, ambulate without assistance, walk a block and climb a few steps at a reasonable pace, prepare simple meals and feed himself, care for his personal hygiene, and sort, handle, and use "paper/files."  (*Id.* at 259.)  Finally, Dr. Thompson indicated that each of the limitations that he identified either had lasted or would last for 12 consecutive months. (*Id.*)

e.      **2009 Treatment Records**

On August 20, 2009, Plaintiff was examined by Denise Morales, LMSW ("Morales"), at the Greater Hudson Valley Family Health Center, Inc. (*Id.* at 282.) During Plaintiff's appointment with Morales, Plaintiff "described feelings of depression" related to his grief over the death of his mother. (*Id.*) Morales determined that Plaintiff's reported symptoms were consistent with diagnoses of a depressive disorder and anxiety disorder. (*Id.*) She also noted that Plaintiff had difficulty concentrating and that his intelligence "need[ed] investigation." (*Id.* at 290-92.)

The following day, Plaintiff was seen in the Emergency Department of the Orange Regional Medical Center for an unspecified "psychiatric problem." (*Id.* at 260-63.) The Record does not clearly identify the reason for the visit, or what occurred during the visit, but does show that Plaintiff was discharged with educational materials regarding depression. (*Id.* at 261.)

On September 1, 2009, Plaintiff underwent an annual physical examination at the Crystal Run Healthcare ("Crystal Run"). (*Id.* at 339-41.) The physician who examined Plaintiff, Nishant Nadpara, M.D., assessed him with morbid obesity and depression. (*Id.* at 340.)

On September 4, 2009, Dr. Thompson examined Plaintiff for complaints of lower back pain, numbness in his left leg, and "sharp" and "burning" pain in his left leg and foot. (*Id.* at 1952.) Dr. Thompson reported that Plaintiff's gait was altered due to pain and that Plaintiff had a "moderate left limp." (*Id.*) He also noted that Plaintiff had a "reduced" and "painful" lumbar range of motion. (*Id.*) Further, Dr. Thompson found that Plaintiff was experiencing "severe lumbar and lumbosacral myospasm." (*Id.*) Dr. Thompson's treatment plan for Plaintiff included spinal adjustments, soft tissue therapy, and icing and stretching at home. (*Id.*)

Around the same time, Plaintiff began seeing therapist Barry Bachenheimer, CSW ("Bachenheimer"), at New Visions Psychotherapy & Counseling Service, on a weekly basis, which then continued from at least September 2009 to September 2010 and July 2013 to November 2014.  (*Id.* at 358-70, 1136-49.)  It is unclear whether Plaintiff saw Bachenheimer between September 2010 and July 2013.  Bachenheimer's treatment notes reflect discussions with Plaintiff on topics ranging from his continued depression and crying spells over the death of his mother, to such day-to-day subjects as car trouble, hygiene problems, financial distress, lonely holidays, an attempted fundraiser, and, in 2013-2014, delivering pizza in exchange for food and tips.  (*See id.*)  In terms of hygiene, Bachenheimer noted the smell of Plaintiff's clothes and body odor, adding that Plaintiff was "very unkempt."  (*Id.* at 1138-39.)  Plaintiff also reported to Bachenheimer that the last time he had washed his clothes was "over a month ago on average."  (*Id.* at 1138.)

Beginning in mid-September 2009, Plaintiff began seeing psychiatrist Naeem Aftab, M.D. once a month, which he continued through mid-2011, when his visits changed to once every three months.  (*See id.* at 375-83, 895, 923-35, 1949-50.)  According to Dr. Aftab, he treated Plaintiff for "Major Depression and Generalized Anxiety Disorder."  (*Id.* at 280.)  Throughout the course of his treatment of Plaintiff, Dr. Aftab prescribed Plaintiff several anti-depressants, adjusted over time, including Lexapro, Wellbutrin, Abilify, Mirtazapine, Fetzima, Gabapentin, Nuerontin, Remeron, and Sertraline.  (*See id.* at 375-76, 895, 923-26; *compare, e.g.*, *id.* at 908-09, 1127 (listing certain medications in type-written form).)  Dr. Aftab's treatment notes are, for the most part, illegible except for the dates of Plaintiff's visits.[5]

---

[5] As set out *infra* (at Section C(4)), one of the ALJs involved in this matter sent a letter to Dr. Aftab, requesting that he provide transcribed copies of all of his treatment notes because the notes were "illegible" (*see* R. at 704).  Dr. Aftab never responded to the request.  (*See* Dkt. 16

On October 12, 2009, Plaintiff was examined by Dmitri Gorelov, D.O., at Crystal Run for complaints of involuntary movements of his upper extremities and numbness in his thighs.  (*Id.* at 336-38.)  An MRI of Plaintiff's lumbar spine showed "[r]ight greater than left L4 neural canal stenosis," "[r]ight L4 foraminal annular fissure," [m]ild L5-S1 central canal stenosis," "[m]ild right L5 neural canal stenosis," and "age-related degenerative changes," but "[no] significant structural abnormalities."[6]  (*Id.* at 267-68, 271.)  An MRI of Plaintiff's cervical spine showed "C3-C4, C4-C5 and C5-C6 bulges resulting in mild stenosis" and "mild degenerative changes," but "no significant structural abnormalities."  (*Id.* at 269, 272.)

On November 17, 2009, Plaintiff visited Clarkstown Orthopedics ("Clarkstown") with complaints of "moderate" leg pain, aggravated by climbing stairs.  (*Id.* at 899.)  X-rays were taken of Plaintiff's knees, and he was assessed with chondromalacia.[7]  (*Id.* at 900-01.)  He was referred for physical therapy and prescribed Celebrex.  (*Id.* at 901.)

---

(Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), dated Feb. 12, 2016 ("Def. Mem.")), at 14 n.7.)  The Commissioner and Plaintiff's attorney have also stated that Dr. Aftab's treatment notes are "illegible" or at least "difficult to read."  (*See id.* at 14; Pl. Mem., at 7.)

[6] Spinal stenosis is defined as the "narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine to your arms and legs."  http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last accessed Feb. 10, 2017).

[7] Chondromalacia refers to a "grating or grinding sensation during extension of the knee." https://medlineplus.gov/ency/imagepages/8892.htm (last accessed Feb. 10, 2017).  "Symptoms include knee tenderness, pain in the knee after sitting for a prolonged period, knee pain that is worse with stairs or getting out of a chair, and a grating sensation in the knee."  *Id.*

**f.     2010 Treatment Records**

On January 26, 2010, Plaintiff was examined by Nancy Linneman, M.D., at Crystal Run for complaints of dyspnea[8] on exertion.  (*Id.* at 320-22.)  Dr. Linneman noted that Plaintiff had a history of hypercholesterolemia, depression, gastroesophageal reflux disease, and obesity.  (*Id.* at 322.)  She ordered a chest X-ray and pulmonary function testing, and provided Plaintiff with an inhaler.  (*Id.*)  The chest X-ray showed "[f]ocal increased markings at the right base, suspicious for atelectasis[9] versus early/developing subsegmental pneumonia."  (*Id.* at 349.)  The pulmonary function testing showed "[n]ormal spirometry,"[10] "mild air trapping," and normal diffusing capacity.  (*Id.* at 354.)

On April 30, 2010, Plaintiff visited David Alex Jaeger, M.D., Ph.D., with complaints of burning and numbness in his left thigh.  (*Id.* at 384.)  Dr. Jaeger found "evidence of left meralgia paresthetica (compression of lateral femoral cutaneous nerve), likely related to his abdominal pannus." [11]  (*Id.* at 386.)

---

[8] Dyspnea refers to shortness of breath.  http://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890 (last accessed Feb. 10, 2017).

[9] Atelectasis refers to "a complete or partial collapse of a lung or lobe of a lung," and "develops when the tiny air sacs (alveoli) within the lung become deflated." http://www.mayoclinic.org/diseases-conditions/atelectasis/basics/definition/con-20034847 (last accessed Feb. 10, 2017).

[10] "Spirometry measures airflow."  https://medlineplus.gov/ency/article/003853.htm (last accessed Feb. 10, 2017).

[11] "Meralgia paresthetica is a condition characterized by tingling, numbness and burning pain in your outer thigh.  The cause of meralgia paresthetica is compression of the nerve that supplies sensation to the skin surface of your thigh."  http://www.mayoclinic.org/diseases-conditions/meralgia-paresthetica/basics/definition/con-20030852 (last accessed Feb. 10, 2017). "A pannus (also called panniculus adiposus) is a layer of fatty tissue underlying the skin." *Gillie v. Colvin*, No. 14cv3218, 2016 WL 1125819, at * 1 (C.D. Ill. Feb. 22, 2016) (citing *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012), at 1370).

The following month, on May 27, 2010, Plaintiff was examined by Andrew Baherrie, M.D., for left knee pain, which Plaintiff rated as 6/10 and described as "aching" and "throbbing." (*Id.* at 308.)  An X-ray of Plaintiff's left knee showed mild degenerative changes and small suprapatellar effusion.[12]  (*Id.* at 348.)  Dr. Baherrie advised Plaintiff to use NSAIDs as needed and to begin a home exercise program.  (*Id.* at 309.)

On June 22, 2010, Plaintiff visited Dr. Linneman for a follow-up appointment.  (*Id.* at 303.)  Dr. Linneman assessed Plaintiff with morbid obesity, obstructive sleep apnea,[13] and dyspnea, but noted improvement in Plaintiff's dyspnea with medication.  (*Id.* at 303-04.)  She ordered a diagnostic polysomnogram[14] due to Plaintiff's complaints of excessive daytime sleepiness.  (*Id.* at 304.)  The results of the polysomnogram indicated "Moderate Obstructive Sleep Apnea Syndrome with oxygen desaturation."  (*Id.* at 302.)  Plaintiff was advised to lose weight, avoid sedatives, and avoid driving and operation of heavy machinery while sleepy.  (*Id.*)  Later in the year, Plaintiff underwent an additional sleep study, in which it was found that he exhibited "central apneas" and "hypopnea while awake."[15]  (*Id.* at 861-90.)

On September 8, 2010, Plaintiff was seen by Dr. Nadpara for his annual physical examination at Crystal Run.  (*Id.* at 294.)  Dr. Nadpara reported that Plaintiff had a normal gait,

---

[12] An effusion in this context refers to an accumulation of excess fluid.  *See* http://www.mayoclinic.org/diseases-conditions/swollen-knee/basics/definition/con-20026072 (last accessed Feb. 10, 2017).

[13] "Central sleep apnea is a disorder in which your breathing repeatedly stops and starts during sleep."  http://www.mayoclinic.org/diseases-conditions/central-sleep-apnea/home/ovc-20209486 (last accessed Feb. 10, 2017).

[14] A polysomnogram is a sleep study that "records certain body functions as you sleep, or try to sleep."  https://medlineplus.gov/ency/article/003932.htm (last accessed Feb. 10, 2017).

[15] Hypopnea refers to "repetitive episodes of airflow reduction." http://www.mayoclinicproceedings.org/article/S0025-6196(11)62751-1/abstract (last accessed Feb. 10, 2017).

no joint pain or swelling, and no weakness.  (*Id.* at 295.)  She also noted that he was obese, had

"sub-optimal" obstructive sleep apnea, "well[-]controlled" hyperlipidemia, and "stable"

depression.  (*Id.* at 296)  As to Plaintiff's depression, Dr. Nadpara noted that Plaintiff would

continue with his current medications of Lexapro, Remeron, Bupropion, and Gabapentin.  (*Id.*)

> **g.   Letter and Medical Source Statement (Mental)**
> **(Naeem Aftab, M.D. Apr. 20, 2010 and Sept. 23, 2010)**

Dr. Aftab wrote a letter to the Department of Social Services, dated April 20, 2010, in

which he stated that Plaintiff was his patient, and that Plaintiff was "unable to work due to his

psychiatric condition."  (*Id.* at 280.)  Dr. Aftab described Plaintiff's psychiatric condition as

"Major Depression and Generalized Anxiety Disorder."  (*Id.*)

On September 23, 2010, Dr. Aftab completed a "Medical Source Statement of Ability To

Do Work-Related Activities (Mental)" form for Plaintiff.  (*Id.* at 371-74.)  In the form, Dr. Aftab

indicated that Plaintiff had "marked" restrictions (defined in the form as describing "serious

limitation[s]" and a "substantial loss in the ability to effectively function") in interacting with the

public, supervisors, and co-workers, and in responding appropriately to work situations and

changes in a routine work setting.  (*Id.* at 372.)  Dr. Aftab attributed these restrictions to

Plaintiff's depression and anxiety.  (*Id.*)  Dr. Aftab also opined that Plaintiff had problems paying

attention and concentrating.  (*Id.*)

> **h.   2011 Treatment Records**

On February 18, 2011, Plaintiff visited Dr. Nadpara complaining of anxiety and "a

feeling of 'impending doom.'"  (*Id.* at 809.)  Plaintiff denied having any mood swings,

hallucinations, or suicidal ideations.  (*Id.* at 810.)  Dr. Nadpara assessed Plaintiff with having an

acute, generalized anxiety disorder, and prescribed him Xanax.  (*Id.*)

On February 28, 2011, Plaintiff was evaluated at Clarkstown for "moderate" knee pain,

which he reported as having interfered "with some [of his] daily activities."  (*Id.* at 905.)  The

physician assistant who examined Plaintiff's knees found mild-to-moderate tenderness, mild

swelling, and a mildly limited range of motion.  (*Id.* at 906.)  Plaintiff was assessed with "mild"

osteoarthritis of the knees, was referred for physical therapy, and received a refill on his

Celebrex prescription.  (*Id.* at 907.)  Plaintiff underwent physical therapy at Peak Physical

Therapy South, PLCC ("Peak") between March 6, 2011 and April 13, 2011, and was discharged

after reporting 0/10 knee pain and no limitation in his activities of daily living.  (*Id.* at 943.)

Upon discharging Plaintiff, Plaintiff's physical therapist noted that Plaintiff's strength and range

of motion were within normal limits.  (*Id.*)

On May 30, 2011, Plaintiff visited the Arden Hill Emergency Department ("Arden Hill")

with pain and swelling in his right wrist.  (*Id.* at 844.)  After testing, Plaintiff was diagnosed with

"established" and "worsening" carpal tunnel syndrome in the right wrist, and was prescribed

Vicodin.  (*Id.* at 845-46; *see also id.* at 1820.)  Surgery was recommended.  (*Id.* at 846-47.)

Following his emergency visit to Arden Hill, Plaintiff went to Crystal Run for follow-up

appointments, and X-rays were taken.  (*Id.* at 800-03, 1926-27.)  Plaintiff was assessed with

acute cellulitis (*i.e.*, a bacterial infection)[16] of the hand/wrist and acute wrist pain.  (*Id.* at 800-

03.)  His X-rays showed no acute fractures or dislocations, but did show an ulnar positive

---

[16] *See* http://www.mayoclinic.org/diseases-conditions/cellulitis/basics/definition/con-
20023471 (last accessed Feb. 10, 2017).

variance[17] and a mildly widened scapholunate joint space.  (*Id.* at 1926-27.)  On July 15, 2011, Plaintiff visited Clarkstown with continued complaints of right wrist pain, and an MRI was ordered.  (*Id.* at 902-04.)  The results of the MRI were "consistent with a bone bruise" and possible ligament tear.  (*Id.* at 920.)  On August 26, 2011, Plaintiff returned to Crystal Run for a follow-up appointment.  (*Id.* at 1787-89.)  Plaintiff's infection had resolved and he no longer complained of any pain.  (*Id.* at 1787-88.)  He did, however, continue to complain of swelling. (*Id.* at 1788.)  The doctor who examined him assessed him with degenerative joint disease in his wrist, and noted that Plaintiff was "not a good historian," as he was "not sure whether he had [had] any trauma to the right wrist."  (*Id.* at 1787-88.)

Plaintiff visited Dr. Linneman on September 6, 2011, for a follow-up appointment regarding his sleep apnea, obesity, and asthma.  (*Id.* at 794.)  As to Plaintiff's sleep apnea, Dr. Linneman reported that Plaintiff's CPAP[18] compliance and clinical results were "[e]xcellent."  (*Id.* at 795.)  In terms of Plaintiff's obesity, Dr. Linneman indicated that Plaintiff had lost "some weight with walking for exercise."  (*Id.* at 794.)  She also noted that Plaintiff's asthma was "[d]oing well," and that Plaintiff was "[b]eing active."  (*Id.*)

---

[17] An "ulnar variance" refers to the relative length of the ulna (a bone in the forearm) to the radius (another bone in the forearm).  *See* https://www.ncbi.nlm.nih.gov/pubmed/8171975 (last accessed Feb. 10, 2017).  A positive ulnar variance is "harmful for the ulnar compartment of the wrist as it causes degeneration and perforation of the triangular fibrocartilage complex (TFCC) and cartilaginous wear of the carpal bones (ulnar impaction syndrome)."  *Id.*

[18] "Continuous positive airway pressure (CPAP) therapy is a common treatment for obstructive sleep apnea," which involves "a small machine that supplies a constant and steady air pressure, a hose, and a mask or nose piece."  http://www.mayoclinic.org/diseases-conditions/sleep-apnea/in-depth/cpap/art-20044164 (last accessed Feb. 10, 2017).

### i.   2012 Treatment Records

On March 5, 2012, Plaintiff visited Viral R. Sheth, M.D., at Orange Cardiology PLLC. (*Id.* at 1021-23.)  Dr. Sheth reported that Plaintiff denied suffering from asthma and had no joint swelling at the time.  (*Id.* at 1021.)  Dr. Sheth also reported that Plaintiff had undergone an electrocardiogram test, and that the results were normal.  (*Id.*)  In conducting a "mental status/neurologic" examination of Plaintiff, Dr. Sheth found "no depression, anxiety, or agitation."  (*Id.* at 1022.)  Dr. Sheth ultimately assessed Plaintiff with dyslipidemia (*i.e.*, high blood cholesterol levels)[19] and shortness of breath.  (*Id.*)

The following month, on April 12, 2012, Plaintiff saw Dr. Nadpara for a routine follow-up appointment.  (*Id.* at 1742-44.)  She reported that Plaintiff was in no apparent distress, had no joint pain, swelling, or weakness.  (*Id.* at 1742.)  She also noted that he was still obese, but that his cholesterol levels were well-controlled.  (*Id.* at 1743.)

Plaintiff had another routine follow-up appointment at Crystal Run on August 22, 2012 with Riaz Rahman, M.D.  (*Id.* at 1693-97.)  Dr. Rahman reported that Plaintiff's sleep apnea, depression, and hyperlipidemia were "stable," that his asthma was under "fair control," and that his obesity was under "sub-optimal control."  (*Id.* at 1694.)

On October 4, 2012, Plaintiff visited Zewditu Bekele Arcuri, M.D., at Crystal Run, with complaints of numbness and burning in his both thighs, and pain shooting from his back into his legs.  (*Id.* at 764.)  After a physical examination, Dr. Arcuri assessed Plaintiff with sciatica, ordered an MRI, electromyogram, and nerve conduction study, and referred Plaintiff for physical

---

[19] https://medlineplus.gov/ency/article/000403.htm (last accessed Feb. 10, 2017).

therapy "as needed if in pain." (*Id.* at 766-77.) The MRI revealed mild multilevel spondylosis,[20] mild canal stenosis, and bilateral neural foraminal narrowing.[21] (*Id.* at 829-30.) The results of the electromyogram and nerve conduction study were "within normal limits," but showed evidence of right L5 radiculopathy. (*Id.* at 891-92.) Plaintiff underwent physical therapy from November 1, 2012 to November 12, 2012, and was discharged after reporting that he was experiencing no leg pain and no limitations in his activities of daily living. (*Id.* at 938.)

### j.     2013 Treatment Records

On February 18, 2013, Plaintiff visited Crystal Run with complaints of "mild/moderate" left knee pain over the prior two months. (*Id.* at 1630.) An X-ray taken of Plaintiff's knee showed "[m]inimal left knee degenerative change." (*Id.* at 1923.)

On April 11, 2013, Plaintiff had a routine follow-up appointment with Dr. Linneman. (*Id.* at 732-35.) Plaintiff reported that he had been "going to the gym" with no significant respiratory difficulties, and denied that any of his activities of daily living were limited by respiratory complaints. (*Id.* at 732.) Plaintiff also reported that he was experiencing depression and weight gain. (*Id.*) In her treatment notes, Dr. Linneman stated that Plaintiff had gained 24 pounds over the prior six months. (*Id.*)

Plaintiff returned to Clarkstown on April 22, 2013 with complaints of bilateral knee pain. (*Id.* at 908.) An X-ray of both knees was taken and Plaintiff was assessed with bilateral knee degenerative joint disease. (*Id.* at 909-10.) He received a corticosteroid injection in his left

---

[20] "'Lumbar spondylosis' is a degenerative joint disease affecting the lumbar vertebrae and intervertebral discs, causing pain and stiffness." *Suarez v. Colvin*, 102 F. Supp. 3d 552, 558 n.7 (S.D.N.Y. 2015) (citing *Dorland's Illustrated Medical Dictionary* at 1754).

[21] Bilateral neural foraminal narrowing refers to narrowed spacing in the nerve passageways of the spine, which may lead to nerve compression or pinching. *See* https://www.laserspineinstitute.com/back_problems/foraminal_narrowing/types/bilateral/ (last accessed Feb. 10, 2017).

knee, and was referred for physical therapy.  (*Id.*)  Shortly thereafter, Plaintiff resumed physical

therapy at Peak, where he was assessed with "symptoms consistent with bilateral knee arthritis,"

including "impaired joint mobility, motor function, muscle performance, and range of motion

associated with localized inflammation."  (*Id.* at 950-51.)   Plaintiff underwent physical therapy

from April 25, 2013 until he was discharged on May 16, 2013.  (*See id.* at 952-60.)  Upon being

discharged, Plaintiff reported to his physical therapist that the pain in his left knee had

diminished.  (*Id.* at 959-60.)  He also no longer had any complaints of functional limitations.  (*Id.*

at 960.)

Plaintiff visited Crystal Run again on May 30, 2013, however, complaining of 3/10 right

knee pain and requesting a cortisone injection.  (*Id.* at 717-18.)  He receive the injection as

requested.  (*Id.* at 719.)  Additionally, an X-ray was taken, which revealed "[m]ild right knee

degenerative change."  (*Id.* at 827.)

On November 22, 2013, Plaintiff went back to Clarkstown, complaining of pain in both

knees.  (*Id.* at 911.)  At his appointment, he was assessed with osteoarthritis of the knees and

bilateral knee degenerative joint disease, advised to start a home exercise program, and told to

resume physical therapy.  (*Id.* at 912.)  Plaintiff complied with the instruction to resume physical

therapy, and, following his December 2, 2013 session, Plaintiff's physical therapist reported that

Plaintiff had "decreased patella and joint mobility, poor [lower extremity] flexibility[,] and

decreased [active range of motion] in [both] knees."  (*Id.* at 962.)  Plaintiff returned to

Clarkstown on December 18, 2013 with continued complaints of knee pain, and received

Synvisc One injections[22] in both knees.  (*Id.* at 914-16.)  On December 30, 2013, Plaintiff

---

[22] A Synvisc One injection "is used to treat knee pain caused by osteoarthritis (OA) in
patients who have already been treated with pain relievers (e.g., acetaminophen) and other non-

reported to his physical therapist that his pain had been "low to none" since receiving the injections in his knees, and denied functional limitations.  (*Id.* at 974.)  He was discharged from physical therapy shortly thereafter.  (*Id.* at 975.)

### k. Mental Residual Functional Capacity Statement (Naeem Aftab, M.D., July 31, 2013)

On July 31, 2013, Dr. Aftab completed a "Mental Residual Functional Capacity Statement" for Plaintiff.  (*Id.* at 895-98.)  In that document, Dr. Aftab opined that Plaintiff had several "Category II" (defined as "[p]reclud[ing] performance for 5% of an 8-hour work day") and "Category III" (defined as "[p]reclud[ing] performance for 10% of an 8-hour work day") limitations in activities related to understanding, memory, sustained concentration, social interaction, and adaptation.  (*Id.* at 895-97.)  For example, Dr. Aftab opined that Plaintiff had "Category II" limitations in maintaining attention and concentration for extended periods of time and responding appropriately to change in the work setting.  (*Id.* at 896-97.)  He also opined that Plaintiff had "Category III" limitations in understanding and remembering detailed instructions and carrying out detailed instructions.  (*Id.* at 896.)  Dr. Aftab also concluded, however, that Plaintiff, without limitation, was able to "[u]nderstand and remember very short and simple instructions," "[c]arry out very short and simple instructions," "[s]ustain an ordinary routine without special supervision," "[m]ake simple work-related decisions," "[i]nteract appropriately with the general public," "[a]sk simple questions or request assistance," "[m]aintain socially appropriate behavior, and . . . adhere to basic standards of neatness and cleanliness," and "[b]e aware of normal hazards and take appropriate precautions."  (*Id.* at 896-97.)

---

drug treatments that did not work well."  http://www.mayoclinic.org/drugs-supplements/hylan-polymers-a-and-b-injection-route/description/drg-20074573 (last accessed Feb. 10, 2017).

Considering Plaintiff's "physical and mental limitations taken in combination," Dr. Aftab determined that Plaintiff would be unable to perform a job (*i.e.*, would be "off task") for 15 percent of an eight-hour workday. (*Id.* at 897.) Dr. Aftab also concluded that, due to Plaintiff's physical and/or mental impairments and his need for ongoing or periodic treatment, he would be absent from work more than six days per month and unable to complete a full eight-hour work day more than six days per month. (*Id.*) Dr. Aftab further opined that Plaintiff would only be 20 percent as efficient as an average worker. (*Id.* at 898.)

Finally, Dr. Aftab stated his belief, "within a reasonable degree of medical certainty," that, due to Plaintiff's medical impairments and physical and/or mental limitations, Plaintiff would be "unable to obtain and retain work in a competitive work environment, 8 hours per days, 5 days per week." (*Id.* at 898.) In the "[a]dditional comments and remarks" section of the form, Dr. Aftab noted that Plaintiff had a history of depression and anxiety, had been taking multiple psychiatric medications, was "cognitively slow," was "unable to do simple calculations at times," had "poor" attention and concentration, and had an "impaired" memory. (*Id.*)

### 4.   Evidence from Plaintiff's Date Last Insured Through the Date of the ALJ's Decision (Dec. 31, 2013 – May 28, 2015)

#### a.   2014 Treatment Records

On January 28, 2014, Plaintiff visited Mark D. Medici, M.D., at Clarkstown, with complaints of lower back pain. (*Id.* at 917-19.) Plaintiff also reported to Dr. Medici that he was experiencing anxiety and trouble sleeping, and was "feeling sad more than usual." (*Id.* at 917.) An X-ray of Plaintiff's lumbosacral spine was taken, which revealed "[d]isc space narrowing" at L5-S1. (*Id.* at 918-19.) Dr. Medici ultimately assessed Plaintiff with lumbar degenerative disc disease and advised him to resume physical therapy. (*Id.* at 919.)

Plaintiff visited Dr. Rahman on March 21, 2014, and reported that his mood had been "down" recently and that he had been "wanting to stay home more." (*Id.* at 1477.) Plaintiff apparently went to Dr. Rahman for these concerns because his psychiatrist was on vacation. (*Id.*) The following month, on April 14, 2014, Plaintiff visited Dr. Linneman and reported "increased anxiety" when he drank a specific energy drink. (*Id.* at 1461.) Dr. Linneman advised him to stop drinking the energy drink. (*Id.* at 1463.)

On April 29, 2014, Plaintiff saw a physician assistant at Crystal Run, complaining of pain in his left knee. (*Id.* at 1444-46.) Shortly thereafter, he resumed physical therapy at Peak to treat his pain. (*Id.* at 976-85.) As his pain continued despite the therapy, Plaintiff requested and received a cortisone injection in his left knee from Crystal Run on May 28, 2014. (*Id.* at 1393-95.) Shortly thereafter, Plaintiff was discharged from physical therapy at Peak. (*Id.* at 985.) In Plaintiff's treatment notes, his physical therapist reported that Plaintiff's pain had "decreased to a manageable level" and that his functioning had "improved." (*Id.*)

Plaintiff visited Crystal Run again on June 24, 2014, with complaints of swelling in his left leg. (*Id.* at 1372-74.) An X-ray was taken of both of his knees at that time, revealing "[s]table, minimal degenerative changes of the right knee" and "[p]rogressive degenerative changes of the left knee with joint effusion." (*Id.* at 1382-83.) Although, ahead of the appointment, Plaintiff had requested a cortisone injection in his right knee, Plaintiff was "asymptomatic" in terms of right knee pain on the day of the appointment. (*Id.* at 1372-74.) Accordingly, he was not given a cortisone injection on that day. (*Id.* at 1373.)

Plaintiff was examined by Dr. Linneman on October 13, 2014 for his sleep apnea, obesity, and asthma. (*Id.* at 1337-40.) In terms of Plaintiff's sleep apnea, Dr. Linneman noted that Plaintiff had "[e]xcellent CPAP compliance with [a] good clinical response." (*Id.* at 1339.)

As for Plaintiff's obesity, Dr. Linneman found that Plaintiff had gained nine pounds over the prior six months.  (*Id.* at 1337.)  Finally, regarding Plaintiff's asthma, Dr. Linneman reported that Plaintiff had denied any limitations in his activities of daily living due to respiratory complaints. (*Id.*)

Plaintiff underwent physical therapy for his left knee at Peak again, beginning on December 15, 2014.  (*Id.* at 1158.)  Plaintiff's physical therapist reported that his "clinical findings [were] consistent with a musculoskeletal pattern of impaired joint mobility, motor function, muscle performance, and range of motion associated with connective tissue dysfunction."  (*Id.*)  Plaintiff continued physical therapy at Peak until he was discharged to a home exercise program on January 7, 2015.  (*Id.* at 1172.)  On that date, Plaintiff reported 0/10 pain in his left knee.  (*Id.*)

On December 17, 2014, Plaintiff visited his chiropractor, Dr. Thompson, with complaints of lower back pain.  (*Id.* at 1953-54.)  Dr. Thompson noted that Plaintiff had reduced lumbar range of motion, normal cervical range of motion, and mild spasms in his lumbar and cervical spine.  (*Id.* at 1954.)  Dr. Thompson determined that Plaintiff should undergo "spinal adjustments as needed on [a] symptomatic basis, manual traction, [and] soft tissue therapy."  (*Id.*)

Plaintiff saw Dr. Rahman for his annual physical examination on December 30, 2014. (*Id.* at 1322-26.)  Outside of Plaintiff's obesity and "mildly flat affect," Dr. Rahman indicated that the results of the physical examination were "normal."  (*Id.* at 1324.)  The following week, Plaintiff visited Dr. Rahman again with mental health concerns, apparently relating to Plaintiff's loss or impending loss of insurance coverage for his psychiatric medications.  (*Id.* at 1312.) Dr. Rahman left a message for Dr. Aftab regarding Plaintiff's concerns.  (*Id.* at 1314.)

> **b.    Consultative Psychiatric Evaluation, Intelligence Evaluation, and Medical Source Statement (Mental) (Leslie Helprin, Ph.D., Jan. 19, 2015)**

On January 19, 2015, Dr. Helprin conducted a second consultative psychiatric evaluation of Plaintiff for the purposes of Plaintiff's SSA disability claims.  (*Id.* at 1123-26.)  Plaintiff told Dr. Helprin that he was unable to work due to depression.  (*Id.* at 1123.)  He reported symptoms of "dysphoric moods, crying spells, and social withdrawal."  (*Id.* at 1124.)  He denied symptoms of anxiety, mania, or thought disorder.  (*Id.*)

In conducting a mental status examination of Plaintiff, Dr. Helprin noted that Plaintiff's attention and concentration were impaired due to his cognitive limitations.  (*Id.*)  Dr. Helprin explained that Plaintiff was unable to do simple subtraction, unable to do "serial threes," and "could not understand the task [of serial threes] even after demonstration."[23]  (*Id.* at 1125.)  Dr. Helprin further reported that Plaintiff's recent and remote memory skills were mildly impaired due to his cognitive limitations.  (*Id.*)  Dr. Helprin stated that Plaintiff could recall three out of three objects immediately, but could not recall any after a five minute time delay.  (*Id.* at 1125.)  Dr. Helprin also estimated that Plaintiff's intellectual skills were "in the borderline range," and commented that his "[g]eneral fund of information was somewhat limited."  (*Id.*)

In terms of Plaintiff's vocational skills, Dr. Helprin opined that, due to his cognitive limitations, Plaintiff had "moderate limitations" in his abilities to "follow and understand simple directions and instructions," "complete simple tasks independently," "complete complex tasks independently," and "learn new, simple tasks."  (*Id.*)  Dr. Helprin also opined that Plaintiff had "marked limitations in his ability to maintain attention and concentration," again, due to his

---

[23] "Serial threes" refers to "subtract[ing] . . . serial threes from 100."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).  It is a test used to assess concentration.  *Id.*

cognitive limitations.  (*Id.*)  In contrast, Dr. Helprin found that Plaintiff exhibited no limitations in his abilities to "maintain a regular schedule," "make appropriate simple decisions," "relate adequately with others," and "deal appropriately with stress."  (*Id.*)

Dr. Helprin ultimately concluded that the results of her examination appeared to be consistent with "secondary psychiatric difficulties" that were not significant enough to interfere with Plaintiff's ability to function on a daily basis.  (*Id.* at 1126.)  He recommended that Plaintiff continue receiving psychiatric treatment, and, in the event that he were found not to be disabled, noted that he would benefit from "vocational retraining as needed for a simple job."  (*Id.*)  She also added that Plaintiff could not manage his own funds due to his cognitive limitations.  (*Id.*)

Dr. Helprin also conducted an intelligence evaluation of Plaintiff on January 19, 2015. (*Id.* at 1127-31.)  During that evaluation, Dr. Helprin administered multiple standardized tests to Plaintiff.  The first test was the Wide Range Achievement Test, Fourth Edition ("WRAT-IV"), which Dr. Helprin described as a "standardized achievement measure."  (*Id.* at 1128.)  In the area of "reading/decoding," Plaintiff achieved a score of 58, with a grade equivalent of 2.3, which Dr. Helprin noted as being "significantly below grade completion reported."  (*Id.*)  The second test was the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), which Dr. Helprin described as a "standardized intelligence measure."  (*Id.* at 1128-29.)  Through the WAIS-IV, Plaintiff achieved a Full Scale IQ score of 63.  (*Id.* at 1129.)  Dr. Helprin stated that the results of her evaluation revealed that Plaintiff was "currently functioning overall in the deficient range," with reading skills "significantly below grade completion reported," writing skills that were "deficient," and arithmetic skills that were "fair."  (*Id.*)  She stated that she considered the test results "to be a valid and reliable estimate of [Plaintiff's] current functioning."  (*Id.* at 1128.)

In administering these tests, Dr. Helprin observed that Plaintiff "required repetition of instructions at times due to difficulty understanding," "was exceedingly slow on visual graphomotor tasks," and exhibited fluctuating attention and concentration.  (*Id.*)  She also noted that he gave a "particularly odd response" to one of the questions, stating that the similarity between a badge and crown was "animals."  (*Id.*)  Additionally, at some point during the evaluation, Plaintiff told Dr. Helprin (as noted above), that "he first wrote his name at about sixth or seventh grade."  (*Id.* at 1127.)

Also on January 19, 2015, Dr. Helprin completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" form for Plaintiff.  (*Id.* at 1132-34.)  In that form, Dr. Helprin assessed Plaintiff with having "moderate" limitations (defined as "more than . . . slight," but "still able to function satisfactorily") in understanding, remembering, and carrying out simple and complex instructions, and making judgments on simple and complex work-related decisions.  (*Id.* at 1132.)  As support for his assessment, Dr. Helprin referenced Plaintiff's performance on the WAIS-IV and the fact that, in administering that test, he had to repeat instructions to Plaintiff.  (*Id.*)  Dr. Helprin also opined that Plaintiff's impairments did not affect his ability to "interact appropriately with supervision, co-workers, and the public" or "respond to changes in the routine work setting."  (*Id.* at 1133.)  Finally, she indicated that Plaintiff was unable to "manage benefits in his . . . own best interest."  (*Id.* at 1134.)

### c.   Consultative Orthopedic Examination and Medical Source Statement (Physical) (Rita Figueroa, M.D., Jan. 19, 2015)

Plaintiff also underwent a consultative orthopedic examination on January 19, 2015.  (*Id.* at 1173-75.)  The professional who conducted the examination was Rita Figueroa, M.D., an orthopedic surgeon.  (*Id.* at 1175.)  Plaintiff's chief complaints to Dr. Figueroa were of chronic

back pain due to a motor vehicle accident, bilateral knee arthritis, and carpal tunnel syndrome. (*Id.* at 1173.)  At the time of the examination, Plaintiff weighed 320 pounds.  (*Id.* at 1174.) Dr. Figueroa reported that Plaintiff had a "slow" gait, could not walk on heels, could walk on toes, could do half of a squat, required no help changing for the examination or getting on or off the examination table, and could rise from a chair without difficulty.  (*Id.* at 1174.)  After conducting a physical examination of Plaintiff, Dr. Figueroa diagnosed him with bilateral knee arthritis, chronic lower back pain, and bilateral carpal tunnel syndrome.  (*Id.* at 1175.) Dr. Figueroa opined that, due to his knee arthritis, Plaintiff had "moderate" limitations in activities requiring repetitive kneeling and squatting.  (*Id.*)  Dr. Figueroa also opined, however, that Plaintiff had *no* limitations in activities requiring repetitive bending, lifting, carry, walking, or standing.  (*Id.*)

In addition, Dr. Figueroa completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" form for Plaintiff, dated January 19, 2015.  (*Id.* at 1176-81.) In that form, Dr. Figueroa stated that Plaintiff could lift and carry up to 50 pounds occasionally, but could never lift or carry more than 50 pounds.  (*Id.* at 1176.)  Despite her conclusion in her examination report that Plaintiff had "no limitations" in walking or standing, Dr. Figueroa opined in this form that Plaintiff could only sit, stand, and walk for one hour each at a time without interruption, sit for a total of four hours in an eight hour workday, stand for a total of two hours in an eight-hour workday, and walk for a total of two hours in an eight-hour workday.  (*Id.* at 1177.)[24]  Moreover, Dr. Figueroa reported that Plaintiff could frequently reach, handle, finger, feel, push, and pull with both hands, and frequently operate foot controls.  (*Id.* at 1178.)  In terms

---

[24] The ALJ emphasized this inconsistency in assigning Dr. Figueroa's opinion "little weight."  (R. at 421.)

of environmental limitations, Dr. Figueroa determined that Plaintiff could only occasionally

tolerate unprotected heights and moving mechanical parts, but could frequently tolerate operating

a motor vehicle, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme heat

and cold, and vibrations.  (*Id.* at 1179.)  Finally, Dr. Figueroa indicated on the form that Plaintiff

was able to perform numerous activities, despite his physical impairments, such as shopping,

traveling, caring for his personal hygiene, and sorting, handling, and using paper or files.  (*Id.* at

1180.)

     **C.**    **Procedural History**

         **1.**    **Plaintiff's Application for Benefits and Initial Denial**

As discussed above, Plaintiff applied for SSI and SSDI benefits on March 27, 2009,

alleging that he had become disabled as of December 31, 2007, due to mental health issues,

including depression, and chronic back, neck, and leg pain.  (*Id.* at 135, 142, 152, 176, 187.)  His

claims were denied on June 22, 2009 (*id.* at 67-74), and, on August 6, 2009, Plaintiff requested a

hearing (*id.* at 79-80).  The request was granted and the first of three hearings in this case was

held on September 24, 2010 before ALJ Roberto Lebron.  (*Id.* at 1-44.)  Plaintiff was represented

by attorney Tara Johnson, Esq.  (*Id.* at 3.)

         **a.**    **Plaintiff's First Hearing Before ALJ Lebron (Sept. 24, 2010)**

During the hearing, ALJ Lebron elicited testimony from Plaintiff, a non-examining

psychiatrist, Dr. Leslie Fine, and a vocational expert, Salvatore Garoso ("Garoso").  ALJ Lebron

first questioned Plaintiff regarding his personal, employment, and medical history, subjective

symptoms of pain and depression, and daily activities.  (*Id.* at 1-26.)  In terms of his schooling,

Plaintiff reported taking special education classes and being unable to write in the sixth grade.

(*Id.* at 19-20.)  When ALJ Lebron asked Plaintiff what was currently preventing him from

working, Plaintiff blamed his depression, which he claimed had worsened following the death of

his mother from cancer in January 2009. (*Id.* at 7-9, 20-21.) He also blamed his neck and back

pain. (*Id.* at 9.) Additionally, Plaintiff testified that he had sleep apnea and carpal tunnel, which

also limited his functioning. (*Id.* at 26-27.)

Upon completion of Plaintiff's testimony, ALJ Lebron questioned Dr. Fine as to

Plaintiff's mental impairments. Apparently due to the timing of Plaintiff's attorney's submission

of Plaintiff's various medical records to the SSA, Dr. Fine had not reviewed any treatment

records from Plaintiff's psychiatrist, Dr. Aftab, or Plaintiff's therapist, Barry Bachenheimer,

prior to testifying. (*Id.* at 28-32.) Instead, he principally relied on the report of consulting

psychologist, Dr. Helprin. (*Id.* at 30-31.) In doing so, he admitted that he did not know whether

Plaintiff had any past or present psychiatric treatment, did not know the rationale for his

antidepressant prescriptions, and had never seen any "real assessment as to [Plaintiff's] mental

state." (*Id.* at 29-31.) ALJ Lebron commented that Dr. Fine's admitted lack of medical records

"could be problematic," but allowed his testimony. (*Id.* at 29.) Dr. Fine testified that he

"believe[d]" that he could draw a conclusion as to Plaintiff's mental impairments based upon the

evidence before him. (*Id.* at 30.) He then stated his opinion that Plaintiff's mental impairments

did not meet or equal Listing 12.04 (depressive, bipolar and related disorders) from 20 C.F.R.

Pt. 404, Subpt. P, App. 1; that "he could do simple and repetitive work"; and that he had "mild"

limitations in activities of daily living, "moderate" limitations in socializing, and "moderate"

difficulties in concentration, persistence, and pace (R. at 30-32). Outside of paraphrasing

Dr. Helprin's opinion, Dr. Fine did not elaborate further on the reasons for his testimony. (*See*

*id.*)

30

After Dr. Fine completed his testimony, ALJ Lebron questioned the vocational expert, Garoso, as to whether Plaintiff could perform any jobs in the national economy. On the basis of the non-exertional limitations discussed by Dr. Fine, Garoso testified that Plaintiff would *not* be able to return to his prior jobs because they "would require some ability to make . . . judgments [and] some ability to sustain concentration," and "that even the simple work of a fast food worker [would] require[] the ability to work a cash register, do prep cooking, and things like that." (*Id.* at 34.) Garoso also testified, however, that, on the basis of Plaintiff's education, work experience, and testimony at the hearing, he could perform jobs involving "simple repetitive kinds of duties that . . . [could] accommodate some lack of concentration or focus," including work as a dishwasher, production assembly worker, or housekeeper. (*Id.* at 35-37.)

At the close of the hearing, Plaintiff's attorney spoke on his behalf. She stated that she had tried to find information regarding why Plaintiff was found disabled between 1981 and 1988, but was unsuccessful. (*Id.* at 40-41.) She also noted that the Record did not contain any intelligence evaluation of Plaintiff, which she argued would be relevant, given Plaintiff's "history of mental retardation" and the possibility that an IQ score of 70 or lower could bring Plaintiff's impairments within Listing 12.05 (intellectual disorder). (*Id.* at 41.) She also told ALJ Lebron that the "appropriate" disability onset date in this case was January 2009 – not December 31, 2007 – because January 2009 was one year after Plaintiff had stopped working, the time that Plaintiff's mother passed away, and the time that Plaintiff had begun psychiatric treatment. (*Id.* at 42.) Plaintiff's attorney conceded that she "did[ not] have a lot of evidence for '08." (*Id.*)

    **b.**  **ALJ Lebron's November 29, 2010 Decision and**
        **Plaintiff's Request For Review By the Appeals Council**

   On November 29, 2010, ALJ Lebron issued a decision concluding that Plaintiff was not

disabled for the purposes of the Act from December 31, 2007 through the date of his decision.

(*Id.* at 50-58.)  ALJ Lebron found that Plaintiff had not engaged in substantial gainful activity

since December 31, 2007, and that Plaintiff's depressive disordered constituted a "severe

impairment."  (*Id.* at 52.)  ALJ Lebron also found, however, that Plaintiff's impairments did not

meet or medically equal any of the impairments in the Listings.  (*Id.* at 52-53.)  Although ALJ

Lebron acknowledged that the criteria for Listing 12.05 could be met if Plaintiff's full scale IQ

score fell into a certain range, he stated that he "could not find [Plaintiff's] IQ in the record."

(*Id.* at 54.)  ALJ Lebron also determined that Plaintiff had the residual functional capacity

("RFC") to perform "light work," limited to "work involving simple, routine, and repetitive

tasks" and "only simple, work-related decisions," in an "environment free of fast paced

production requirements . . . with few, if any, work[-]place changes."  (*Id.* at 54.)  In formulating

this RFC, ALJ Lebron gave "little weight" to the opinions of Drs. Aftab and Thompson because,

in the ALJ's view, "their opinions [were] not persuasive given the objective evidence of the

record as a whole."  (*Id.* at 56.)  In light of his assessment of Plaintiff's RFC, ALJ Lebron

concluded that Plaintiff was unable to perform any of his past relevant work as a fast food

worker, general hardware salesperson, and sales clerk.  (*Id.* at 57.)  Considering Plaintiff's age,

"high school education," work experience, and RFC together with the vocational expert's

testimony, however, ALJ Lebron concluded that Plaintiff could perform the work of a

dishwasher, assembler, or housekeeper, and therefore was "not disabled" for the purposes of the

Act.  (*Id.* at 57-58.)

Plaintiff timely filed a request with the Appeals Council for review of ALJ Lebron's

decision, which the Appeals Council denied on January 25, 2012.  (*Id.* at 64-66.)  ALJ Lebron's

decision became the final decision of the Commissioner on that date.  (*Id.* at 64.)

### 2.  Plaintiff's Initial Appeal to the District Court and Subsequent Remand

Plaintiff appealed to this Court on February 17, 2012 by filing a Complaint captioned

*Newell v. Astrue*, No. 12cv1237 (PKC).  (R. at 543-44.)  Before the Commissioner answered or

moved with respect to the Complaint, the parties stipulated that the action should be remanded

back to the SSA for further administrative proceedings.  (*Id.* at 546-47.)  Judgment was entered

remanding the action on September 12, 2012.  (*Id.* at 545.)

On March 14, 2013, the Appeals Council issued an order vacating ALJ Lebron's

November 29, 2010 decision and remanding Plaintiff's case back to ALJ Lebron.  (*Id.* at 548-52,

600.)  The Appeals Council identified several errors in ALJ Lebron's decision, including his

failure to present hypothetical questions to the vocational expert that corresponded with

Plaintiff's RFC, and his failure to cite specific evidence in rejecting the opinions of Plaintiff's

treating physicians and determining Plaintiff's RFC.  (*Id.* at 551.)  The Appeals Council directed

that, upon remand, ALJ Lebron would be required (1) to "[g]ive further consideration to

[Plaintiff's] maximum residual functional capacity and provide appropriate rationale with

specific references to evidence of record in support of the assessed limitations," and (2) to

"[o]btain supplemental evidence from a vocational expert to clarify the effect of the assessed

limitations on [Plaintiff's] occupational base."  (*Id.* at 550-52.)

### 3.  Plaintiff's Second Hearing Before ALJ Lebron (July, 11, 2013)

ALJ Lebron held a second hearing in Plaintiff's case on July 11, 2013.  (*Id.* at 433-71.)

Plaintiff, represented by attorney Gary Gogerty, Esq. ("Gogerty"), was the only person to testify

at the hearing.  (*Id.* at 435.)  Although ALJ Lebron scheduled a vocational expert to testify, the expert failed to attend.  (*Id.* at 436.)  In light of this, ALJ Lebron proposed collecting vocational expert testimony through interrogatories.  (*Id.*)  Plaintiff's attorney, Gogerty, replied that he "th[ought] that [would] be fine," but stated his intention to respond to the vocational expert's interrogatory testimony.  (*Id.* at 436, 469.)

During the hearing, Plaintiff testified that he was 5'7" tall and weighed either 314 or 317 pounds (*id.* at 440-41, 443), whereas at the September 24, 2010 hearing, he testified that he was 5'11" tall and weighed between 240 and 270 pounds (*id.* at 3-4).  This testimony caused ALJ Lebron to express concern as to whether he should be considering Plaintiff's obesity in his disability determination.  (*Id.* at 442.)

Plaintiff also stated that he had never obtained a high school diploma.  (*Id.* at 455.)  He testified that, instead, he took special education classes and had received a "certificate saying [he] attended school."  (*Id.* at 455-56.)  He also testified that, in his high school classes, if he did not finish his work, his teachers would finish the work on his behalf.  (*Id.* at 456.)  Plaintiff added that, after high school, he attended cooking school for a year, but did not finish his program.  (*Id.* at 456-57.)

When asked what was keeping him from working at that time, Plaintiff again blamed his depression and back and neck pain.  (*Id.* at 457-58.)  In discussing his symptoms of depression, Plaintiff reported that, upon leaving his apartment, "something . . . [would] push[] [him] to go back home."  (*Id.* at 460.)  In discussing his back and neck pain, Plaintiff stated that he experienced pain "about" every day, and rated the pain as four or five out of 10.  (*Id.* at 463.)  He admitted, however, that the pain medications that he was taking made the pain go away

completely.  (*Id.*)  He also reported that he had stopped seeing his chiropractor, Dr. Thomas, because he could no longer afford to keep seeing him.  (*Id.* at 458.)

Plaintiff further testified that he experienced shortness of breath when climbing stairs, and had to stop and rest two-to-three times, for two-to-three minutes at a time, when climbing two flights of stairs.  (*Id.* at 465, 468.)  He also stated that he had arthritis in both knees and had previously received cortisone shots for pain relief.  (*Id.* at 465.)

Under questioning from his attorney, Plaintiff offered testimony regarding a factory job that he held in the 1980s.  (*Id.* at 461.)  At that job, he worked in an assembly line and filed items with a sander.  (*Id.*)  Plaintiff reported that he was let go because he was "too slow" and could not keep up with the job.  (*Id.*)

On July 18, 2014, ALJ Lebron sent interrogatories to a vocational expert named Esperanza DiStefano ("DiStefano") regarding Plaintiff's case.  (*Id.* at 680-84.)  ALJ Lebron asked DiStefano to consider a hypothetical person with the same age and work experience as Plaintiff, "at least a high school education," and the RFC to perform "light work," limited to "work involving simple, routine, and repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only simple, work-related decision[s], and with few, if any, work[-]place changes."  (*Id.* at 682.)  DiStefano responded that such a hypothetical person would not be able to perform Plaintiff's past work as a retail sales clerk or hardware store clerk because the hypothetical person was limited to "unskilled work," and those jobs were "semi-skilled occupations."  (*Id.* at 687.)  She also stated that the hypothetical person would not be able to work as a fast food employee because that work was too "fast paced" for someone with the hypothetical person's limitations.  (*Id.*)  DiStefano, however, also stated that this

hypothetical person could work as an assembler of small products, housekeeping cleaner, or mail clerk.  (*Id.* at 688.)

In a letter to the SSA, Plaintiff's attorney submitted an objection to DiStefano's interrogatory responses on the grounds that "the hypothetical proffered [was] incomplete" and "there [was] no opportunity to cross examine [DiStefano] on behalf of [Plaintiff]."  (*Id.* at 693.)

### 4.   Plaintiff's Proceedings Before ALJ Gonzalez

On August 6, 2014, the SSA informed Plaintiff's attorney by letter that ALJ Lebron had left the SSA without issuing a final decision in Plaintiff's case, and that the case would be reassigned to a new ALJ.  (*Id.* at 600.)  Thereafter, ALJ Robert Gonzalez took over the case. (*Id.* at 474.)  In December 2014, ALJ Gonzalez wrote three letters to Plaintiff's treating physicians requesting additional documents and information relating to their medical opinions and notes in the Record.  In one letter, dated December 19, 2014, ALJ Gonzalez requested that Dr. Aftab submit a "detailed written report" within three weeks that answered about 25 detailed questions, including subparts.  (*Id.* at 694-96.)  That same day, ALJ Gonzalez wrote a separate letter to Dr. Thompson requesting that he also submit a "detailed written report" within three weeks that answered numerous specific questions.  (*Id.* at 699-702.)  On December 24, 2014, ALJ Gonzalez sent a follow-up letter to Dr. Aftab, requesting that he provide transcribed copies of over 30 pages of treatment notes in the Record, because Dr. Aftab's handwritten notes were "illegible."  (*Id.* at 704.)  Neither doctor appears to have responded to ALJ Gonzalez's letters. Moreover, there is no evidence that ALJ Gonzalez ever followed up with either doctor after the 2014 holidays.

### a.   Plaintiff's Hearing Before ALJ Gonzalez (Feb. 3, 2015)

On February 3, 2015, ALJ Gonzalez held the third hearing in Plaintiff's case, at which Plaintiff and vocational expert, Robert Baker ("Baker"), testified.  (*Id.* at 472-542.)  Plaintiff was again represented by Gogerty.  (*Id.* at 475.)  During the hearing, Plaintiff testified that he continued to suffer from depression.  (*Id.* at 506-07.)  He stated that he was treating his depression with medication prescribed by Dr. Aftab.  (*Id.* at 507.)  He also indicated that he had joined a support group for people who had lost loved ones.  (*Id.*)  According to Plaintiff, both the medication and support group helped him "a little bit."  (*Id.*)  Plaintiff also testified that his back pain had worsened to "seven" on a 10-point scale, and that he had resumed seeing a chiropractor. (*Id.* at 501-02.)  According to Plaintiff, the pain gave him trouble standing and walking, but not sitting.  (*Id.*)  Plaintiff also noted that he continued to suffer from neck pain, which he rated as four out of 10, and which "sometimes" worsened upon looking side-to-side.  (*Id.* at 505.)  Under questioning from his attorney, Plaintiff offered additional testimony that it was difficult for him to focus on tasks, that he often got lost while driving because he confused left turns and right turns, and that he had difficulty remembering things.  (*Id.* at 512-13.)

After Plaintiff's attorney finished questioning Plaintiff, ALJ Gonzalez shifted the focus of the hearing to Plaintiff's association with the restaurant, Napoli's.  Apparently having read Plaintiff's references to Napoli's in Bachenheimer's treatment notes, ALJ Gonzalez asked Plaintiff a series of questions about his "work" for the restaurant.  (*Id.* at 513-24.)  Plaintiff testified that he had worked at Napoli's as a "bus person" while his mother was alive, but was let go when business "got slow."  (*Id.* at 515-16.)  Plaintiff remained acquainted with the restaurant's owner, Angelo Siderias ("Siderias"), however, and, at some point, began delivering pizzas for the restaurant in exchange for meals.  (*Id.* at 513-4, 516-17.)  Plaintiff testified that he

did not get paid by the restaurant (*id.* at 516), but was permitted to keep tips from customers (*id.* at 518).  Plaintiff also reported that he went to Napoli's "[a]bout every day" from about 5:00 p.m. to 9:00 p.m., completed about two or three deliveries per day, and made $15.00 on average in tips per day.  (*Id.* at 513-14, 517-19.)

Under questioning by ALJ Gonzalez, Plaintiff testified that he began making deliveries for Napoli's "[m]ostly about a month ago."  (*Id.* at 522.)  ALJ Gonzalez then pointed out to Plaintiff that certain medical records indicated that Plaintiff had begun making deliveries for Napoli's in 2010.  (*Id.* at 522-23.)  In response, Plaintiff explained that those records could have pertained to a different pizza restaurant, but he was not sure.  (*Id.* at 522-24.)[25]

After questioning Plaintiff, ALJ Gonzalez elicited testimony from the vocational expert, Baker.  (*Id.* at 528.)  ALJ Gonzalez first asked Baker to consider a hypothetical person with Plaintiff's age, education, and work history, who had the ability to perform the full range of "medium" work, but with the following limitations:  he could only "understand, remember, and carry out simple work"; could occasionally crouch, stoop, and kneel; "must avoid concentrated exposure to dust, fumes, and noxious gases"; and would be able to adapt to routine workplace changes and make simple work-related decisions.  (*Id.* at 529-30.)  Baker testified that such a hypothetical person could perform the jobs of a fast-food worker, photo-copy machine operator, dining-room attendant, and "cook helper."  (*Id.* at 529-31.)  ALJ Gonzalez then asked Baker to

---

[25] After the hearing, Plaintiff's attorney provided ALJ Gonzalez with an affidavit from Siderias.  (*Id.* at 712-13.)  In that affidavit, Siderias stated that Plaintiff was a long-time customer at his restaurant, and that he had allowed Plaintiff to sit in the restaurant because "[Plaintiff] ha[d] nowhere else to go."  (*Id.* at 713.)  He also stated that Plaintiff, while not an employee of his restaurant, had made short local deliveries for the restaurant "[o]n occasion, . . . in exchange for either food or the tips he receive[d] from the customer."  (*Id.*)  According to Siderias, Plaintiff "[did] not do multiple deliveries at one time because he [was] not capable of doing so," and that the "few tasks" that Plaintiff did do for the restaurant "[were] to help him out and to provide him with something to eat."  (*Id.*)

consider a second hypothetical person, with an RFC identical to the first one, except with a limitation to "light" work.  (*Id.* at 532.)  According to Baker, such a person could perform the jobs of a fast-food worker, photocopy machine operator, "marker," and "router."  (*Id.* at 532-33.) Finally, ALJ Gonzalez asked Baker to consider a third hypothetical person, with an RFC identical to the previous two, except with a limitation to "sedentary" work.  (*Id.* at 534.)  Baker testified that, while such a person could not perform any of Plaintiff's past jobs, he could perform the job of an "addresser" and a "cutter and paster" of press clippings.  (*Id.* at 534-35.)

Under questioning by Plaintiff's attorney, Baker testified that someone who was off task more than 15 percent of the day, or who could not understand or follow simple directions, would not be employable.  (*Id.* at 539.)

On May 28, 2015, ALJ Gonzalez issued a decision denying Plaintiff's applications for SSDI and SSI benefits.  (*Id.* at 408-25.)  ALJ Gonzalez's decision is discussed in detail below. (*See* Discussion, *infra*, at Section II.)

### 5.    The Current Action and the Motions Before the Court

Plaintiff filed the Complaint in this action on September 9, 2015.  (*See* Compl.) Defendant filed a motion for judgment on the pleadings on February 12, 2016 (*see* Dkt. 15; *see also* Dkt. 16 (Def. Mem.)), and Plaintiff filed cross motion for judgment on the pleadings on April 12, 2016 (*see* Dkt. 19; *see also* Dkt. 20 (Pl. Mem.)).  Despite being given until April 26, 2016 to reply to Plaintiff's submissions (Dkt. 18), Defendant never submitted any such reply. Both Plaintiff's and Defendant's motions were referred to this Court for a report and recommendation on June 6, 2016.  (Dkt. 22.)

## DISCUSSION

I.  **APPLICABLE LEGAL STANDARDS**

    A.  **Standard of Review**

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether

a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the

Commissioner's decision rests on adequate findings supported by evidence having rational

probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v.*

*Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir.

1997).  Thus, if the correct legal principles have been applied, this Court must uphold the

Commissioner's decision upon a finding of substantial evidence, even where contrary evidence

exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial

evidence to support either position, the determination is one to be made by the factfinder."); *see*

*also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where

substantial evidence supported both sides).

### B.    The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An

individual is considered to be under a disability only if the individual's physical or mental

impairments are of such severity that he or she is not only unable to do his or her previous work,

but also cannot, considering his or her age, education, and work experience, engage in any other

kind of substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in

the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R.

§§ 404.1520, 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).

Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir.

1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is

engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If not,

at the second step, the ALJ determines whether the claimant has a "severe" impairment or

combination of impairments that significantly limits his or her physical or mental ability to do

basic work activities. *Id.* §§ 404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii), (c). If the claimant does

suffer from such an impairment, then the third step requires the ALJ to determine whether this

impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

§§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If it does, then the claimant is presumed to be disabled

"without considering [the claimant's] age, education, and work experience." *Id.*

Where the plaintiff alleges a mental impairment, steps two and three require the ALJ to

apply a "special technique," outlined in 20 C.F.R. §§ 404.1520a and 416.920a, to determine the

severity of the claimant's impairment at step two, and to determine whether the impairment

satisfies Social Security regulations at step three. *See Kohler v. Astrue*, 546 F.3d 260, 265

(2d Cir. 2008). If the claimant is found to have a "medically determinable mental impairment,"

the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the

presence of the impairment(s)," then "rate the degree of functional limitation resulting from the

impairment(s) in accordance with paragraph (c) of [Sections 404.1520a and 416.920a]," which

specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) episodes of decompensation.[26]  20 C.F.R.

§§ 404.1520a(b)(2), (c)(3); 416.920a(b)(2), (c)(3); *see Kohler*, 546 F.3d at 265.  The functional

limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate,

marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated

on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R.

§§ 404.1520a(c)(4), 416.920a(c)(4).

     If the claimant's impairment does not meet or equal a listed impairment, then the ALJ

must determine, based on all the relevant evidence in the record, the claimant's RFC, or ability to

perform physical and mental work activities on a sustained basis.  *Id.* §§ 404.1545, 416.945.  The

ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether

the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.*

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her

past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's

RFC, age, education, and work experience, the claimant is capable of performing "any other

work" that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), (g); 416.920(a)(4)(v), (g).

     On the first four steps of the five-step evaluation, the claimant generally bears the burden

of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (citation omitted).

At the fifth step, the burden shifts to the Commissioner to "show that there is work in the

national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306

---

[26] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

(2d Cir. 2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).  The

Commissioner must establish that the alternative work "exists in significant numbers" in the

national economy and that the claimant can perform this work, given his or her RFC and

vocational factors.  20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can

satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R.

Pt. 404, Subpt. P, App. 2 (the "Grids").  Where, however, the claimant suffers from

nonexertional impairments (such as mental impairments) that "'significantly limit the range of

work permitted by his [or her] exertional limitations,'" the ALJ is required to consult with a

vocational expert," rather than rely exclusively on these published Grids.  *Zabala v. Astrue*,

595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986)

(citations omitted)).  "A nonexertional impairment 'significantly limit[s]' a claimant's range of

work when it causes an 'additional loss of work capacity beyond a negligible one or, in other

words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful

employment opportunity.'"  *Id*. at 410-11 (quoting *Bapp*, 802 F.2d at 605-06).

## C.   The Treating Physician Rule

The medical opinion of a treating source as to "the nature and severity of [a claimant's]

impairments" is entitled to "controlling weight," where the opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

"[T]reating source" is defined as the claimant's "own physician, psychologist, or other

acceptable medical source who . . . has provided [the claimant] with medical treatment or

evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R.

§§ 404.1502, 416.902.[27]  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion. 20 C.F.R. §§ 404.1502, 416.927(c)(2).  Failure to "give good reasons" is grounds for remand. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)[28]), including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole; and (5) the specialization of the physician providing the opinion, 20 C.F.R.

---

[27] A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  20 C.F.R. §§ 404.1502, 416.902.

[28] On February 23, 2012, the Commissioner amended 20 C.F.R. §§ 404.1527 and 416.927, by, among other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs (c) through (e).

§§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); *see Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (noting that these five factors "must be considered when the treating physician's opinion is not given controlling weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see* Social Security Ruling 96-2p (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000). A consultative physician's opinion, by contrast, is generally entitled to "little weight." *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and citation omitted). This is because consultative examinations "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citation omitted).

### D.  Duty to Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the

claimant is represented by counsel.'"  *Id.* at 79 (quoting *Perez*, 77 F.3d at 47).  The SSA

regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will
> develop your complete medical history . . . [and] will make every
> reasonable effort to help you get medical reports from your own
> medical sources when you give us permission to request the
> reports. . . .  'Every reasonable effort' means that we will make an
> initial request for evidence from your medical source and, at any
> time between 10 and 20 calendar days after the initial request, if
> the evidence has not been received, we will make one followup
> request to obtain the medical evidence necessary to make a
> determination.

20 C.F.R. §§ 404.1512(d), (d)(1); 416.912(d), (d)(1).  The regulations further explain that a

claimant's "complete medical history" means the records of his or her "medical source(s)."  *Id.*

§§ 404.1512(d)(2), 416.912(d)(2).  If the information obtained from medical sources is

insufficient to make a disability determination, or if the ALJ is unable to seek clarification from

treating sources, the regulations also provide that the ALJ should ask the claimant to attend one

or more consultative evaluations.  20 C.F.R. §§ 404.1512(e), 404.1517, 416.912(e), 416.917.

Where there are no "obvious gaps" in the record and where the ALJ already "possesses a

complete medical history," the ALJ is "under no obligation to seek additional information in

advance of rejecting a benefits claim."  *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x

82, 84 (2d Cir. 2015) (summary order) (quoting *Rosa*, 168 F.3d at 79 n.5).

### E.   Assessment of a Claimant's Credibility

Assessment of a claimant's credibility with respect to subjective complaints about his or

her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-

step process.  Where a claimant complains that certain symptoms limit his or her capacity to

work, the ALJ is required, first, to determine whether the claimant suffers from a "medically

determinable impairment[] that could reasonably be expected to produce" the symptoms alleged.

20 C.F.R. § 416.929(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ must take

the second step of evaluating the intensity and persistence of the claimant's symptoms.  *Id.*; *see*

*also Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010).  In doing so, the ALJ must

consider all of the available evidence, and must not "reject statements about the intensity and

persistence of pain and other symptoms 'solely because the available objective medical evidence

does not substantiate [the claimant's] statements.'"  *Cichocki v. Astrue*, 534 F. App'x 71, 76

(2d Cir. 2013) (quoting 20 C.F.R. § 416.929 (c)(1)).  Instead, where the claimant's contentions

regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ

must consider the other evidence and make a finding as to the claimant's credibility, in order to

determine the extent to which the claimant's symptoms affect his or her ability to do basic work

activities.  *Id.*; *see also Meadors*, 370 F. App'x at 183 (citing 20 C.F.R. § 404.1529(c)(3)(i)-

(vii)[29]); *Taylor v. Barnhart*, 83 F. App'x 347, 350-51 (2d Cir. 2003) (summary order); Social

Security Ruling ("SSR") SSR 96-7p (S.S.A. July 2, 1996).[30])

"While an ALJ 'is required to take [a] claimant's reports of pain and other limitations

into account' [in making a credibility determination] . . . he or she is 'not required to accept the

---

[29] Although the particular regulation cited in the *Meadors* decision does not apply to
SSI claims, a related regulation that does apply to such claims contains the same language.
*See* 20 C.F.R. § 416.929(c)(3)(i)-(vii).

[30] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p.  *See* SSR 16-3p,
2016 WL 1237954 (Mar. 28, 2016).  The new ruling eliminates the use of the term "credibility"
from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is
not an examination of an individual's character."  *Id.* at *1.  Instead, adjudicators are instructed
to "consider all of the evidence in an individual's record when they evaluate the intensity and
persistence of symptoms after they find that the individual has a medically determinable
impairment(s) that could reasonably be expected to produce those symptoms."  *Id.* at *2.  Both
the two-step process for evaluating an individual's symptoms and the factors used to evaluate the
intensity, persistence and limiting effects of an individual's symptoms remain consistent between
the two rulings.  *Compare* SSR 96-7p *with* SSR 16-3p.  As the ALJ's decision in this matter was

48

claimant's subjective complaints without question.'" *Campbell v. Astrue*, 465 F. App'x 4, 7

(2d Cir. 2012) (summary order) (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).

"Rather, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony

in light of the other evidence in the record." *Id*. The ALJ must, however, include "specific

reasons for [his or her] finding on credibility, supported by the evidence in the case record," and

the reasons must make it sufficiently clear for a reviewer to determine "the weight the [ALJ]

gave to the [claimant's] statements and the reasons for that weight." SSR 96-7p. The factors

that an ALJ should consider in evaluating the claimant's credibility are: (1) the claimant's daily

activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating

and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications

taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has

received for relief of the symptoms; (6) any other measures that the claimant employs to relieve

the symptoms; and (7) other factors concerning the claimant's functional limitations and

restrictions as a result of the symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii),

416.929(c)(3)(i)-(vii).

## II.   **THE ALJ'S DECISION**

On May 28, 2015, ALJ Gonalez ("the ALJ") issued a decision finding that Plaintiff had

not been disabled since his claimed onset date of December 31, 2007. (*See generally* R. at 408-

25.) In reaching this decision, the ALJ applied the five-step sequential evaluation procedure.

---

issued before the new regulation went into effect, this Court will review the ALJ's credibility
assessment under the earlier regulation, SSR 96-7p.

A.      **Steps One Through Three of the Sequential Evaluation**

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 31, 2007.  (*Id.* at 410.)  At step two, the ALJ determined that Plaintiff suffered from the following "severe" impairments:  depression, intellectual disability, bilateral chondromalacia of knees, lumbosacral and cervical degenerative disease, bilateral degenerative joint disease of the knees, morbid obesity, asthma, and left meralgia paresthetica.  (*Id.* at 411.) In making these findings, the ALJ rejected Plaintiff's claims that he was also disabled due to sleep apnea, carpal tunnel syndrome, reflux disorder, hyperlipidemia, and leg edema.  (*Id.* at 411.)  The ALJ determined that there was no evidence in the Record that these alleged impairments caused Plaintiff any functional limitations.  (*Id.*)

At step three, the ALJ found that Plaintiff's impairments, considered "singly or in combination," did not meet or medically equal any impairments in the Listings of 20 C.F.R. Pt. 404, Subpt. P, App. 1 or SSR 02-1p (S.S.A. Sept. 12, 2002), which provides guidance on evaluating obesity under the Act.  (*Id.* at 411-13.)  In terms of Listings, the ALJ specifically considered Listings 1.00 (musculoskeletal system), 3.00 (respiratory system), and 12.00 (mental disorders), and concluded that Plaintiff's impairments did not meet or medically equal the criteria of those Listings.  (*Id.* at 411-13.)  In dismissing the applicability of Listing 12.05 (intellectual ability), specifically with respect to paragraph C of that Listing (relating to IQ), the ALJ stated that Plaintiff "d[id] not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  (*Id.* at 413.)

B.     **The ALJ's Assessment of Plaintiff's RFC**

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, finding that Plaintiff

had "the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)

and 416.967(b)," subject to the following exceptions:

> [He] can understand, remember and carry out simple work
> and adapt to routine workplace changes, as well as make simple work-
> related decisions.  He can occasionally climb stairs, crouch, stop,
> and kneel.  He must avoid concentrated exposure to dust, fumes
> and noxious gases.

(R. at 413.)  In making this finding, the ALJ stated that he had "considered all [of Plaintiff's]

symptoms and the extent to which th[o]se symptoms [could] reasonably be accepted as

consistent with the objective medical evidence and other evidence."  (*Id.*)

The ALJ also reviewed Plaintiff's medical history and the opinion evidence from

Plaintiff's treating, examining, and non-examining medical sources.  (*Id.* at 414-22.)  In doing so,

the ALJ gave "little weight" to the opinion of Plaintiff's treating psychiatrist, Dr. Aftab (*id.* at

416-17); "little weight" to the opinion of Plaintiff's treating chiropractor, Dr. Thompson,

regarding Plaintiff's limitations as to sitting, standing, and walking (*id.* at 420); and "great

weight" to Dr. Thompson's opinion regarding Plaintiff's ability to lift and carry up to 20 pounds

(*id.*).  As to examining consultants, the ALJ gave "great weight" to the May 21, 2009 opinion of

consultative psychologist, Dr. Helprin (*id.* at 415); "little weight" to Dr. Helprin's later,

January 19, 2015 opinion (*id.* at 418); "great weight" to the opinion of consultative internist,

Dr. Adams, (*id.* at 420); and "little weight" to the opinion of consultative orthopedist, Dr.

Figueroa (*id.* at 421).  Finally, as to non-examining consultants, the ALJ gave "some weight" to

part of the opinion of non-examining psychiatrist, Dr. Mata (*id.* at 416); "little weight" to a

separate part of Dr. Mata's opinion (*id.*); and "some weight" to the opinion of consultative

psychiatrist, Dr. Fine, who had testified at the September 24, 2010 hearing on the basis of an

incomplete medical record (*id.*).  To the extent that Plaintiff challenges the ALJ's weighing of these opinions, the ALJ's stated reasons for the weights he assigned are discussed further *infra*, at Section III(B).

In connection with making his RFC determination, the ALJ also conducted an assessment of Plaintiff's credibility.  Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," the ALJ concluded that Plaintiff's "statements concerning the intensity persistence and limiting effects of th[o]se symptoms [were] not entirely credible."  (*Id.* at 414.)  In drawing the conclusion that Plaintiff was less than fully credible, the ALJ focused on Plaintiff's "off-the-books" association with Napoli's.  (*See id.* at 414, 422.)  Indeed, in his 18-page opinion, the ALJ referenced Plaintiff's association with Napoli's no less than a dozen separate times, often referencing that "work" in order to discount both Plaintiff's own testimony and the medical opinions in the Record.  (*See id.* at 411-12, 414-17, 420-22.)  At one point in his opinion, the ALJ accused Plaintiff of having "attempted to conceal" his pizza delivery "work" with Napoli's from the SSA, and of having offered "vague" and "shifting" testimony as to his hours, pay, and length of association with Napoli's.  (*Id.* at 414.)  The ALJ even stated that there was a question in this case "as to whether [Plaintiff's] continuing unemployment [was] actually due to the alleged medical impairments or the fact that he [was] presently working off the books and waiting to secure disability benefits."  (*Id.* at 422.)  According to the ALJ, the Record showed that Plaintiff had been working at Napoli's "for at least several years."  (*Id.* at 412.)

In weighing Plaintiff's credibility, the ALJ also considered Plaintiff's "activities of daily living."  (*Id.*)  According to the ALJ, Plaintiff's activities included shopping, doing laundry, going to weekly support group meetings, driving a car, organizing a fundraiser, working "off-

the-books" as a pizza delivery driver, and taking care of his ailing mother in 2008.  (*Id.*)  In finding Plaintiff less than fully credible, the ALJ also characterized Plaintiff's treatment as "essentially routine and/or conservative," and made the observation that, at the February 3, 2015 hearing, Plaintiff "betrayed no evidence of debilitating symptoms while testifying."  (*Id.* at 422-23.)

### C.    Steps Four and Five of the Sequential Evaluation

At step four of the sequential evaluation, the ALJ concluded, without any apparent reliance on any vocational expert's testimony, that Plaintiff was able to perform his past relevant work as a fast-food worker (DOT # 311.472-010).  (*Id.* ("In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as generally performed.").)

Although the ALJ could have stopped at step four and determined that Plaintiff was not disabled for the purposes of the Act, he proceeded to make "alternative findings" at step five of the sequential evaluation.  (*Id.*)  At step five, the ALJ found that, in light of Plaintiff's age, the fact that Plaintiff supposedly obtained "at least a high school education," his work experience, and his RFC, Plaintiff could perform the jobs of photo copier (DOT # 207.685-014), marker (DOT # 209.587-034), and router (DOT # 222.587-038).  (*Id.* at 423-24.)  The ALJ relied on the testimony of vocational expert Baker, in making these findings.  (*Id.* at 424.)  The ALJ also relied on Baker's testimony in concluding that each of these jobs existed in significant numbers in the national economy, supporting the ALJ's finding that Plaintiff was not disabled for the purposes of the Act.  (*Id.*)

Ultimately, the ALJ concluded that Plaintiff had been capable of adjusting to work sufficiently existing in the national economy, and therefore had not been under a disability as

defined in the Act from December 31, 2007 through the date of the ALJ's decision, May 28,

2015.  (*Id.* at 424-25.)

## III.   REVIEW OF THE ALJ'S DECISION

In support of her motion for judgment on the pleadings, the Commissioner argues that the

ALJ's decision is supported by substantial evidence and free from legal error.  (*See* Def. Mem.,

at 25.)  In support of his cross-motion, Plaintiff argues that the ALJ's decision is flawed for three

reasons:  (1) the ALJ erred in not concluding that substantial evidence supported a finding that

Plaintiff met Listing 12.05C; (2) the ALJ violated the treating physician rule in refusing to give

controlling weight to the opinions Plaintiff's treating physicians; and (3) the ALJ erred in

assessing Plaintiff's credibility.  (*See* Pl. Mem., at 13.)

As discussed below, this Court agrees with the substance of each of Plaintiff's arguments,

but the different arguments, if accepted, do not all point to the same remedy.  If Plaintiff is

correct that the ALJ should have concluded that Plaintiff's claimed mental impairments met a

Listing, then Plaintiff should simply be found to be disabled at step three of the five-step

sequential evaluation, and the matter should be remanded solely for the calculation of benefits.

*See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see also Dixon v. Shalala*, 54 F.3d 1019,

1022 (2d Cir. 1995) ("If a claimant's condition meets or equals the 'listed' impairments, he or

she is conclusively presumed to be disabled and entitled to benefits.").  If, on the other hand,

Plaintiff is only correct that the ALJ erred in the weight he assigned to the opinions of Plaintiff's

treaters, and/or in his assessment of Plaintiff's credibility, then the matter should be remanded to

the ALJ, with directions to apply the applicable standards, and for further consideration, in light

of those standards.  *See Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199-200 (2d Cir.

2010); *Rosa*, 168 F.3d at 82 n.7; *Cullen v. Comm'r of Soc. Sec.*, No. 15cv1180 (JCF), 2016 WL

3144050, at *8 (S.D.N.Y. May 19, 2016).  Provided the correct standards are applied, the Court should not substitute its view as to the proper weight to accord physician opinions, or as to the credibility of a claimant, for the determination of the ALJ.  *See Cichocki*, 534 F. App'x at 75; *Puente v. Comm'r of Soc. Sec.*, 130 F. Supp. 3d 881, 893-95 (S.D.N.Y. 2015).

Given that I find that substantial evidence in the Record does not support the ALJ's determination at step three, I recommend reversal, and remand for the calculation of benefits.  If however, the Court does not adopt this recommendation, then I alternatively recommend, based on Plaintiff's additional arguments, that the matter be remanded for additional proceedings before the ALJ.

### A. Reversal and Remand for the Calculation of Benefits Is Warranted, Based on the ALJ's Error, at Step Three, in Not Finding Plaintiff Disabled Under Listing 12.05C.

In considering Listing 12.05C at step three of the sequential evaluation, the ALJ stated, "[Plaintiff] does not have a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  (R. at 413.)  The evidence in the Record, however, does not support this finding.

### 1. Listing 12.05C

As discussed above, a claimant is presumed to be disabled if his or her impairments meet or medically equal an impairment listed in 20 C.F.R. Pt. 4, Subpt. P, App. 1.  *See Dixon*, 54 F.3d at 1022.  Listing 12.05 (intellectual disability) states:

> Intellectual disability refers to significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

  C. A valid verbal, performance, or full scale IQ of 60 through 70
    and a physical or other mental impairment imposing an
    additional and significant work-related limitation of function.

20 C.F.R. Part 404, Supt. P, App. 1 § 12.05.[31]

   A claimant may meet his or her burden of demonstrating that he or she suffers from

"significantly subaverage intellectual functioning . . initially manifested . . before age 22" under

Listing 12.05 through circumstantial evidence, including evidence "that he [or she] attended

special education classes, failed to complete high school, or had difficulties in reading, writing or

math." *Davis v. Astrue*, No. 7:06cv657 (LEK), 2010 WL 2925357, at *4 (N.D.N.Y. July 21,

2010) (collecting cases); *see also Brown v. Colvin*, No. 15cv4823 (RLE), 2016 WL 5394751, at

*12 (S.D.N.Y. Sept. 17, 2016) (ordering remand where the ALJ failed to consider circumstantial

evidence of an early onset of intellectual disability in finding that the plaintiff was not disabled

under Listing 12.05C). The claimant's burden on this point may also be met, however, by

submitting evidence of a valid, full scale IQ score between 60 and 70. *Talavera v. Astrue*,

697 F.3d 145, 152 (2d Cir. 2012). In other words, if the first requirement of Subsection C

(a valid IQ score in the range of 60 through 70) is satisfied, then the threshold portion of the

Listing (requiring "significantly subaverage intellectual functioning") is also satisfied. Further,

the results of an IQ test taken after the age of 22 are presumed to reflect an individual's

intellectual functioning before the age of 22. *Id.* This is because, absent evidence of trauma or

some other event that negatively impacted the individual's metal capacity, courts presume that

individuals have a "'fairly constant IQ throughout [their] li[ves].'" *Id.* (citation omitted).

---

[31] Although this Listing was revised effective January 17, 2017, *see* 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), this Court will review the ALJ's decision under the text of the Listing as it existed at the time that the ALJ issued his decision, *see Brothers v. Colvin*, No. 7:16cv100 (MAD), 2017 WL 530525, at *4 n.2 (N.D.N.Y. Feb. 9, 2017).

Whether a claimant has "deficits in adaptive functioning" under Listing 12.05 is a separate, but related, inquiry without any "necessary connection" to a claimant's IQ score. *Talavera*, 697 F.3d at 153. Although, under the Listing, a claimant's "inadequate adaptive functioning must arise from [his or] her cognitive limitations, rather than from a physical ailment or other infirmity," *id.*, the Second Circuit has held that individuals with low IQ scores "may still be able to hold a full-time job, and are therefore not disabled, if their adaptive functioning is sufficiently intact," *id.* (citation and internal quotation marks omitted).

"Adaptive functioning refers to an individual's ability to cope with the challenges of ordinary everyday life." *Id.* In determining whether a claimant has deficits in adaptive functioning, courts consider factors such as "living on one's own, independently caring for children, cooking, paying bills, communication abilities, and daily living skills." *Stephens v. Colvin*, No. 3:15cv622 (TWD), 2016 WL 4094885, at *6 (N.D.N.Y. Aug. 2, 2016) (citation omitted); *see also Burnette v. Colvin*, 564 F. App'x 605, 607 (2d Cir. 2014) ("A person suffers from a deficit in adaptive functioning if she is unable to satisfactorily cope with the challenges of ordinary life, including living on one's own, taking care of children without help sufficiently well that they have not been adjudged neglected, paying bills, and avoiding eviction." (internal quotation marks and citations omitted)). Listing 12.05 does not, however, require that a claimant have a "complete lack of adaptive functioning" or be "completely helpless" in order to be deemed to have deficits in adaptive functioning. *Stephens*, 2016 WL 4094885, at *7 (holding that the ALJ's determination that the plaintiff did not suffer from deficits in adaptive functioning was not supported by substantial evidence where the record indicated, *inter alia*, that the plaintiff had poor hygiene and poor dental health, only prepared his own food once a month, was dependent on his wife for keeping track of his appointments, prescriptions, and bills, and

required reminders to take his medications); *see generally Balsamo*, 142 F.3d at 81 ("We have stated on numerous occasions that a claimant need not be an invalid to be found disabled under the [Act]." (internal quotation marks and citation omitted)).

Finally, courts have interpreted the appropriate inquiry into the second prong of Subsection C of the Listing (the requirement that a claimant has suffered from "a physical or other mental impairment imposing an additional and significant work-related limitation of function") to be equivalent to the inquiry into whether a claimant's impairments should be characterized as "severe" as defined at step two of the sequential analysis.  *Salem v. Colvin*, No. 5:12cv1441 (MAD) (VEB), 2014 WL 975696, at *5 n.4 (N.D.N.Y. Mar. 12, 2014) (citing, *e.g.*, *Baneky v. Apfel*, 997 F. Supp. 2d 543, 546 (S.D.N.Y. 1998)); *see also Brothers*, 2017 WL 530525, at *5 (finding that the plaintiff suffered from impairments imposing additional and significant work-related limitations under Listing 12.05C because the ALJ found, at step two, that certain of the plaintiff's impairments were "severe").

## 2.    Plaintiff's Satisfaction of the Elements of the Listing

Here, based on the evidence contained in the Record, Plaintiff satisfied his burden of demonstrating that he met Listing 12.05C, and the Record lacks substantial evidence to support the ALJ's contrary conclusion.

### a.    Plaintiff Demonstrated the Requisite Subaverage Intelligence, Through Evidence of His IQ Score.

While the ALJ acknowledged that, in January 2015, Plaintiff had achieved a full scale IQ score of between 60 and 70 on a standardized intelligence test administered by consultative

examiner and psychologist, Dr. Helprin,[32] he characterized that score as "poorly supported" by Plaintiff's adaptive functioning skills.  (R. at 417-18.)  As set out above, however, a claimant's level of *adaptive* functioning should not be seen as "supporting," or not "supporting" the claimant's *intellectual* functioning.  Rather, the two represent separate concepts, requiring separate inquiries, and the latter – as already discussed – may be satisfied with a full-scale IQ-test score alone.

In stating that Plaintiff's IQ score was "poorly supported," the ALJ did not challenge Dr. Helprin's qualifications, the legitimacy of the test that he administered, or Plaintiff's behavior during the test.  *Cf. Vasquez-Ortiz v. Apfel*, 48 F. Supp. 2d 250, 256 (W.D.N.Y. 1999) (noting that an ALJ had rejected the results of an IQ test because the plaintiff allegedly provided inadequate responses on purpose).  Nor did the ALJ argue that the test results were inconsistent with any other evidence in the Record relating to Plaintiff's intellectual functioning (as opposed to his adaptive functioning).  *See Talavera*, 697 F.3d at 153 ("[T]here is no necessary connection between an applicant's IQ scores and her relative adaptive functioning").

Moreover, to the extent that the ALJ considered evidence relating to Plaintiff's intellectual functioning elsewhere in his decision, his one apparent finding was erroneous.  Despite undisputed evidence to the contrary, the ALJ asserted that Plaintiff "ha[d] at least a high school education."  (R. at 423.)  According to a letter from Plaintiff's high school, Plaintiff's own testimony, and Plaintiff's attorney's representations, Plaintiff took special education classes in high school and was awarded an IEP diploma at the age of 19.  (*Id.* at 19-20, 34-35, 150, 455-56, 1127.)  As defined by New York State Education Department regulations, IEP diplomas are

---

[32] The ALJ erroneously stated that Plaintiff achieved a full scale IQ score of 64, when Plaintiff in fact achieved a score of 63.  (*Id.* at 418, 1129.)  This error, however, is immaterial given that both scores are between 60 and 70, and therefore sufficient to trigger Listing 12.05.

issued to pupils with learning disabilities and are not equivalent to high school diplomas or

general equivalency diplomas (GEDs).  *See* 8 N.Y.C.R.R. §§ 100.5(b)(7)(iii), 100.9; *see also*

*Stephan v. W. Irondequoit Cent. Sch. Dist.*, 769 F. Supp. 2d 104, 107 (W.D.N.Y.), *aff'd*, 450 F.

App'x 77 (2d Cir. 2011).  Furthermore, IEP diplomas are "less likely to be accepted by

employers or four-year colleges."  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 667 (2d

Cir. 2012).  Thus, to assert that Plaintiff "ha[d] at least a high school education" under these facts

is misleading and cannot constitute substantial evidence to support the ALJ's rejection of

Plaintiff's IQ score.

      In discrediting Plaintiff's IQ score as "poorly supported," the ALJ also referenced

Dr. Helprin's lack of a longitudinal treatment relationship with Plaintiff, as well as Dr. Helprin's

lack of access to reports from Plaintiff's treating sources.  (*See* R. at 418.)  For these purported

reasons, the ALJ assigned "little weight," overall, to Dr. Helprin's evaluation of Plaintiff's

cognitive functioning.  (*Id.*)  Conspicuously, though, the ALJ gave "great weight" to

Dr. Helprin's 2009 opinion regarding Plaintiff's mental functioning, without making any

reference, in that regard, to the doctor's lack of a treating relationship with Plaintiff or access to

reports from his treating sources.  (*Id.* at 415.)  To raise these purported deficiencies only on

Dr. Helprin's second, more-detailed, and test-based evaluation of Plaintiff – but not his first – is

inconsistent, and suggests that the ALJ improperly "cherry-picked" parts of Dr. Helprin's

opinions that supported the ALJ's conclusion, while ignoring others.  *See Correale-Englehart v.

Astrue*, 687 F. Supp. 2d 396, 439 (S.D.N.Y. 2010) (noting that it was "improper" for the ALJ to

have "cherry-picked some of the findings of the [consultative examiner] – notably those that

minimized plaintiff's psychological limitations – and [to have] ignored others").

In particular, the ALJ ignored the narrative sections of Dr. Helprin's 2015 report, which supported Dr. Helprin's conclusion that Plaintiff's test results were "valid and reliable." (*See* R. at 1128.)  Nowhere in his decision did the ALJ mention Plaintiff's reported inability to perform or understand the concept of serial threes; his need for Dr. Helprin to repeat instructions; his inability, on a memory test, to remember any of three previously displayed objects after five minutes; the fact that he stated that the similarity between a badge and crown was "animals"; or the fact that Dr. Helprin described Plaintiff as being "exceedingly slow on visual graphomotor tasks." (*Id.* at 1125, 1128.)  Nor did the ALJ mention Plaintiff's scores on the other intelligence tests that Dr. Helprin administered, such as Plaintiff's score on the WRAT-IV examination, which placed his reading skills at near the second-grade reading level. (*Id.* at 1128.)

Additionally, it seems likely that, had Dr. Helprin reviewed reports from Plaintiff's treating sources, he would have found more, rather than less, of a reason to believe that Plaintiff's IQ score was a "valid and reliable estimate of [Plaintiff's] current functioning," as he had already concluded. (*Id.* at 1128.)  Plaintiff's psychiatrist, Dr. Aftab, who had begun treating Plaintiff in September 2009, stated in a 2013 report that Plaintiff was "cognitively slow," was "unable to do simple calculations at times," and had numerous limitations in the areas of attention, concentration, and memory. (*Id.* at 895-98; *see also id.* at 371-74.)  Dr. Aftab also opined twice in the Record – once in 2010 and again in 2013 – that Plaintiff was unable to work due to his mental impairments. (*Id.* at 280, 898.)  Moreover, Plaintiff's social worker, Denise Morales, noted in a report that Plaintiff had difficulty concentrating and that his intelligence "need[ed] investigation." (*Id.* at 290-92.)

Accordingly, this Court finds that the ALJ's seeming decision to disregard Plaintiff's full scale IQ score was not supported by substantial evidence, and that his decision to do so

improperly substituted his opinion for the competent medical opinion of Dr. Helprin. *See Vasquez-Ortiz*, 48 F. Supp. 2d at 257 (citing *Balsamo*, 142 F.3d at 81). Indeed, "most courts assume that a valid IQ result in the numerical range satisfies the first prong of 12.05C, and no additional inquiry is appropriate." *Castillo v. Barnhart*, 00cv4343 (MBM), 2002 WL 31255158, at *14 n.6 (S.D.N.Y. Oct. 8, 2002) (citing *Nieves v. Sec'y of Health & Human Servs.*, 775 F.2d 12, 14 n.5 (1st Cir. 1985)).

### b.    Plaintiff Offered Substantial Evidence of Deficits in Adaptive Functioning, Arising From Cognitive Limitations.

The ALJ found that Plaintiff's adaptive functioning skills "include[d] driving, traveling independently by taxi, living on his own, taking care of his personal hygiene as well [as] his personal finances, and having a long work history prior to the period he was alleging disability." (R. at 418.) A close review of the Record, however, shows that the ALJ overstated these points.

First, although Plaintiff drove, he reported that he would often get lost while driving because he would confuse left with right turns. (*Id.* at 512-13.) He also stated that he had gotten into four or five car accidents in the span of two years. (*Id.* at 1136.) Plaintiff also reported that he did not know how to use public transportation. (*Id.* at 224.) Second, while Plaintiff lived on his own, he testified that his landlord sometimes cleaned his apartment for him. (*Id.* at 446.) There is also no suggestion in the Record that Plaintiff was able to prepare his own meals, other than by microwaving "T.V. dinners" (*id.* at 148), and the Record further reflects that Plaintiff was provided some of his meals by a local restaurant, which let him stay there (*id.* at 516; *see also id.* at 713). Third, as to personal hygiene, Plaintiff's therapist made several comments in treatment notes indicating that Plaintiff had poor hygiene. (*Id.* at 1138 (commenting on the smell of Plaintiff's clothes, Plaintiff's body odor, and Plaintiff's poor laundry habits), 1139 (stating that "[Plaintiff] was also very unkempt and I pointed out he needs to take better care of his

hygiene which right now is pretty much not in good shape").)  Fourth, regarding Plaintiff's purported ability to take care of his personal finances, Plaintiff testified that he did not pay rent, did not have an electricity bill, television bill, or telephone bill, and only received and managed food stamps and tips from occasionally delivering pizzas.  (*Id.* at 487-88, 500, 517-18.) Moreover, Dr. Helprin opined in 2009 that Plaintiff would "need assistance managing his funds due to his cognitive limitations," and opined in 2015 that Plaintiff could not manage his own funds for the same reason.  (*Id.* at 225, 1126.)  Finally, as to Plaintiff's purported long work history prior to alleging disability, there is evidence in the Record that Plaintiff was deemed disabled by the SSA from 1981 to 1988, and that Plaintiff was laid off from an assembly-line job for being too slow.  (*Id.* at 152, 461.)[33]

Apart from day-to-day living factors, courts have also recognized that "attendance in special education classes and an education pursuant to an IEP" are indicative of deficits in adaptive functioning.  *See Lyons v. Colvin*, No. 7:13cv614 (TJM), 2014 WL 4826789, at *9 (N.D.N.Y. Sept. 29, 2014) (citations omitted); *DeCarlo v. Astrue*, No. 8:06cv488 (LEK) (VEB), 2009 WL 1707482, at *6 (N.D.N.Y. June 17, 2009) ("Courts have found circumstantial evidence, such as the following, sufficient to infer deficits in adaptive functioning prior to age 22:  evidence a claimant attended special education classes; dropped out of school before graduation; or had difficulties in reading, writing, or math").  In this case, Plaintiff reported attending special education classes beginning in the third grade and being unable to write his name until the sixth or seventh grade.  (R. at 1127.)  As the ALJ concluded that Plaintiff "ha[d]

---

[33] In examining evidence of a claimant's day-to-day adaptive functioning, courts may also consider whether the claimant ever independently cared for any children.  *See Stephens*, 2016 WL 4094885, at *6.  In this case, the Record reflects that Plaintiff never had any children (R. at 136), and that the one time that he independently cared for a pet cat, the cat died because, according to Plaintiff, he "couldn't afford the vet too much" (*id.* at 500-01).

at least a high school education," it is apparent that the ALJ did not take Plaintiff's history of special education into consideration in finding that Plaintiff lacked deficits in adaptive functioning.  (*See id.* at 423.)

For these reasons, this Court finds that the ALJ's apparent conclusion that Plaintiff did not manifest deficits in adaptive functioning both during the period under review and prior to age 22 was at odds with, and not supported by, substantial evidence in the Record.

**c.      Plaintiff Demonstrated Other Impairments Imposing an Additional and <u>Significant Work-Related Limitation of Function.</u>**

Finally, in order to determine whether Plaintiff met the second prong of Subsection C of Listing 12.05, the ALJ needed to determine whether Plaintiff had "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Part 404, Supt. P, App. 1 § 12.05C.  On this point, the ALJ, himself, found at step two of his analysis that Plaintiff suffered from several "severe" physical and mental impairments.  (R. at 411.)  As discussed above, this finding was sufficient to satisfy the Subsection C requirement. *See Salem*, 2014 WL 975696, at *5 n.4; *Brothers*, 2017 WL 530525, at *5.

Thus, this Court finds that Plaintiff has shown (a) significantly subaverage intellectual functioning (given his demonstrated IQ score in the 60-70 range), (b) deficits in adaptive functioning that accompanied his intellectual deficits (given, *inter alia*, his background in special education), and (c) an impairment imposing additional and significant work-related limitations (given the ALJ's own finding, at step two, that Plaintiff suffered from "severe" physical and mental impairments).  In light of this, this Court cannot conclude that substantial evidence supports the ALJ's determination, at step three, that Plaintiff was not disabled under Listing 12.05C.

64

Given Plaintiff's "persuasive proof" that he has been disabled under Listing 12.05C since his alleged disability onset date of disability, this Court recommends that the ALJ's decision be reversed and remanded solely for the calculation and payment of benefits to Plaintiff.  *See Cherico v. Colvin*, No. 12cv5734 (MHD), 2014 WL 3939036, at *31 (S.D.N.Y. Aug. 7, 2014) ("If . . . the record provides 'persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose,' the court may reverse and remand solely for the calculation and payment of benefits." (quoting *Parker v. Harris*, 626 F.2d 225 (2d Cir. 1980)); *see also Butts v. Barnhart*, 388 F.3d 377, 385-86 (2d Cir. 2004) ("'[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.'" (quoting *Rosa*, 168 F.3d at 83)).

### B.   Alternatively, If the Court Were Not To Accept the Above Recommendation, Then Remand for Further Proceedings Would Be Warranted.

If the Court were to agree with the above analysis, it would not need to reach Plaintiff's additional arguments.  Nonetheless, those additional arguments, which highlight flaws in the ALJ's application of relevant legal standards to his consideration of the medical opinion evidence and Plaintiff's credibility, are discussed below.

### 1.   Violation of the Treating Physician Rule

Plaintiff contends that the ALJ committed legal error in failing to give controlling weight to the opinions of Plaintiff's treating physicians, with particular focus on his treating psychiatrist, Dr. Aftab, who authored two medical source statements and a letter in the Record concluding that Plaintiff was unable to work.  (Pl. Mem., at 18-21; *see also* R. at 280, 371-74, 895-98.)  The ALJ gave "little weight" to Dr. Aftab's opinions on the grounds that they were supposedly

"poorly supported by [Dr. Aftab's] treatment records," "inconsistent with [Plaintiff's] activities

of daily living," and inconsistent with "the opinions of other examining mental health providers

and the consultative examination of Dr. Helprin in 2009 and opinion of Medical Expert

Dr. Fine."  (*Id.* at 416-17.)

According to the ALJ, unlike Dr. Aftab's stated opinions that Plaintiff could not work

due to his mental impairments (*id.* at 280, 898), Dr. Aftab's treatment notes "repeatedly indicated

that [Plaintiff's] mood was stable with medication management" (*id.* at 416).  It is unclear how

the ALJ has drawn such definitive conclusions regarding the content of Dr. Aftab's treatment

notes when the ALJ himself stated, in a letter dated December 24, 2014, that the notes were

"illegible."  (*Id.* at 704.)  Indeed, in his letter, the ALJ requested that Dr. Aftab provide

transcribed copies of all of his treatment notes in the Record, which, presumably, the ALJ would

not need if he could read the notes in full.  (*Id.*)  As the Commissioner has now acknowledged

that Dr. Aftab's treatment notes are, in fact, "illegible," and that Dr. Aftab never responded to the

ALJ's Christmas Eve request to transcribe over 30 pages of hand-written notes within 10 days

(Def. Mem., at 14 & n.7; R. at 704), this Court is unable to find that substantial evidence

supports the ALJ's interpretation of Dr. Aftab's treatment notes.

This Court also finds that, given the timing of the ALJ's request, it would be

unreasonable to hold Dr. Aftab's lack of a response against Plaintiff or to consider Dr. Aftab's

lack of a response as potentially dispositive of Plaintiff's benefits claims.  This case was

remanded to the SSA in September 2012 (*id.* at 545), and the ALJ originally assigned to this case

left the SSA in August 2014 (*id.* at 600).  The Record contains no explanation as to why the ALJ

had to demand that Dr. Aftab transcribe documents for him during the 2014 holiday season,

rather than at an earlier or later time.  Such a demand was not a "reasonable effort" to develop

the record, particularly given the ALJ's failure to follow up with Dr. Aftab.  20 C.F.R.

§§ 404.15212(d), (d)(1); 416.912(d), (d)(1).  If this case were to be remanded for

reconsideration, this Court would recommend that the ALJ be directed to follow up with

Dr. Aftab to procure transcribed treatment notes, and to provide Dr. Aftab with a reasonable

amount of time to respond.

     As to the ALJ's argument that Plaintiff's activities of daily living undermine Dr. Aftab's

opinions, this Court finds, as it did in the discussion above regarding Plaintiff's purported

deficits in adaptive functioning, that the ALJ has overstated the extent of Plaintiff's activities of

daily living.  (*See* Discussion, *supra*, at Section III(A).)

     Regarding the purported inconsistency of Dr. Aftab's opinion with "other examining

mental health providers," as well as with the 2009 opinion of Dr. Helprin and the September 24,

2010 hearing testimony of Dr. Fine, this Court first notes that no examining mental-health

provider other than Dr. Aftab has submitted any opinion in this case regarding the effect of

Plaintiff's mental health impairments on his ability to work.  The ALJ has also failed to specify

the identities of the "other examining mental health providers" whose views are supposedly

inconsistent with those expressed by Dr. Aftab.  The ALJ does state that,

"[i]nterestingly, . . . Dr. Medici noted that [Plaintiff] exhibited normal level of consciousness,

orientation, judgment, insight, memory, mood and affect," and that Plaintiff's "fund of

knowledge and capacity for sustained mental capacity was deemed within normal limits" (*id.* at

419 (emphasis added)), suggesting that the ALJ may have credited *Dr. Medici's* mental health

assessment of Plaintiff.  Dr. Medici, however, is an orthopedist – not a mental-health provider –

who saw Plaintiff for leg pain.  (*See, e.g.*, *id.* at 899-904.)  Accordingly, Dr. Medici's opinion as

to Plaintiff's mental health should be given less weight than a treating psychiatrist's opinion.

20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  Even if the ALJ intended to reference some other treater's purported opinion, it is the ALJ's duty to provide a sufficient level of specificity in his opinion in resolving evidentiary conflicts so that the reviewing court may "'decide whether the determination is supported by substantial evidence.'"  *Calzada v. Astrue*, 753 F. Supp. 2d 250, 268, 277 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

With respect to the purported inconsistency between Dr. Aftab's opinions, on the one hand, and Dr. Helprin's 2009 opinion (to which the ALJ assigned "great weight" (*see* R. at 415)) and Dr. Fine's 2010 testimony (to which the ALJ assigned "some weight" (*see id*. at 416)), on the other, it bears repeating that, absent "good reasons," a treating physician's opinion is generally entitled to "more weight" than the opinions of non-treating and non-examining sources, *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Dr. Helprin had only examined Plaintiff once before he issued his 2009 opinion, and, unlike in his 2015 examination, he did not administer any intelligence tests to Plaintiff at that time.  (*Id.* at 225.)  Dr. Fine, for his part, had neither examined Plaintiff nor reviewed any of Plaintiff's psychiatric treatment records when he offered testimony, in 2010, as to Plaintiff's mental impairments.  (*Id.* at 28-32.)  In fact, Dr. Fine stated that he had based his testimony principally on Dr. Helprin's 2009 opinion.  (*Id.* at 30-31.)  Even ALJ Lebron acknowledged that Dr. Fine's failure to review any actual mental health treatment records was potentially "problematic."  (*Id.* at 29.)  In contrast, Dr. Aftab had an ongoing treatment relationship with Plaintiff, with appointments once a month beginning in September 2009, and once every three months, beginning in mid-2011.  (*Id.* at 375-83, 895, 923-35, 1949-50.)

Despite the ALJ's obligations under the treating physician rule, he did not appear to take into consideration the length, nature, or extent of treatment relationship that these doctors had with Plaintiff in discounting Dr. Aftab's opinion, and elevating the 2009 (but not the 2015) opinion of Dr. Helprin and the 2010 testimony of Dr. Fine. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Moreover, given the fact that Dr. Fine did not review any of Plaintiff's relevant mental health treatment records before testifying, and the conclusory nature of his testimony, the ALJ's decision to assign greater weight to that testimony than to Dr. Aftab's opinions (and even than to Dr. Helprin's detailed, test-based 2015 opinion) is unsupported by substantial evidence.[34] *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (summary order) ("Because it is unclear whether [the consulting physician] reviewed all of [plaintiff's] relevant medical information, his opinion is not 'supported by evidence of record' as required to override the opinion of [the] treating physician").

Apart from these considerations, it is not even clear that Dr. Aftab's opinions were inconsistent with Dr. Helprin's 2009 opinion. Both Dr. Aftab's 2013 opinion and Dr. Helprin's 2009 opinion, for example, state that Plaintiff could follow and understand simple instructions, make simple work-related decisions, and sometimes carry out more detailed or complex instructions. (*Id.* at 224, 896.) Moreover, the forms given to Dr. Aftab requested that he opine on several topics that Dr. Helprin did not address in her 2009 opinion. For example, unlike

---

[34] The ALJ even appears to have mischaracterized Dr. Fine's testimony when he stated that, "upon review of the medical record, [Dr. Fine] found that [Plaintiff] did not meet or equal *any* listing of impairments within the meaning of the Social Security Regulations." (*Id.* at 416 (emphasis added).) Dr. Fine, in fact, only testified regarding Listing *12.04*, and was not even asked the question of whether Plaintiff's impairments met or equaled any other Listings. (*Id.* at 30.) Dr. Fine also testified that he lacked the expertise to comment on any of Plaintiff's physical impairments. (*Id.* at 32.) Thus, to the extent that the ALJ relied on Dr. Fine's testimony in determining whether Plaintiff's impairments met or equaled Listing 12.05, the ALJ committed further error.

Dr. Helprin, Dr. Aftab answered questions relating to the amount of time that Plaintiff would be expected to be "off task" during a work day, how often he would be absent from work, and how efficient he would be relative to an average worker. (*Compare id.* at 897 *with id.* at 222-25.) Given that Drs. Helprin and Aftab appear to have agreed on several points, and did not disagree on others, the ALJ's determination that the two doctors' opinions were inconsistent is not supported by substantial evidence.

Finally, the ALJ failed to note that Dr. Aftab's opinions were, in many respects, consistent with and supported by Dr. Helprin's 2015 opinions. For example, both doctors stated that Plaintiff had limitations in his abilities to maintain attention and concentration, and to understand, remember, and carry out detailed or complex instructions. (*Id.* at 896, 1125, 1127, 1132.) Both also concluded that Plaintiff's memory was impaired. (*Id.* at 898, 1125.) Additionally, Dr. Aftab's opinion that Plaintiff was "cognitively slow," echoed Dr. Helprin's opinion, made on the basis of standardized test results, that Plaintiff's cognitive skills were in "the deficient range." (*Id.* at 898, 1128-29.)

In sum, the ALJ failed to provide "good reasons" for giving Dr. Aftab's opinions "little weight," while giving greater weight to the 2009 opinion of Dr. Helprin and the 2010 testimony of Dr. Fine. The ALJ therefore violated the treating physician rule, such that, absent reversal, the matter should be remanded to the ALJ for proper application of that rule. *See Gunter*, 361 F. App'x at 199-200.[35]

---

[35] Although Plaintiff argues that the ALJ did not properly weigh the opinions of his "treating *physicians*" (Pl. Mem., at 20-21), the only treater's opinion in the record, other than that of Dr. Aftab, was provided by Plaintiff's chiropractor, Dr. Thompson (*see* R. at 254-59), and a chiropractor is not considered a treating physician for purposes of the treating physician rule, *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995). The mere fact, though, that the Record contains no other medical source opinion regarding Plaintiff's physical impairments – and, indeed, that it contains virtually no useful medical opinion evidence for most of the

## 2.      <u>Improper Assessment of Plaintiff's Credibility</u>

Plaintiff also persuasively argues that the ALJ erred in assessing his credibility by giving

undue weight to the fact that he "makes a few pizza deliveries a few days a week."  (Pl. Mem., at

23.)  As set out above, although the ALJ found that Plaintiff's "medically determinable

impairments could reasonably be expected to cause [his] alleged symptoms," the ALJ also found

that Plaintiff's "statements concerning the intensity, persistence and limiting effects of th[o]se

symptoms [were] not entirely credible."  (R. at 414.)  In arriving at this conclusion, the ALJ

indeed devoted significant attention to Plaintiff's purported "attempt[] to conceal" his "off-the-

books" pizza deliveries for Napoli's.  (*Id.* at 414, 421-23; *see also id.* at 408-25 (discussing

Plaintiff's pizza deliveries on nine of the 18 pages of his opinion).)  In reviewing the ALJ's

decision, Plaintiff's counsel asks this Court to consider that Plaintiff "is a 54 year old man with a

full scale [IQ] score of 63 who is, by all doctor[s'] accounts . . . cognitively challenged and

functioning in the deficient range."  (Pl. Mem., at 23.)  Plaintiff's counsel also contends that a

review of Plaintiff's answers to the ALJ's 13 pages of questioning regarding these pizza

deliveries shows that Plaintiff "did not even think of the deliveries as a job."  (*Id.*)[36]

---

relevant period (given that Drs. Thompson and Adams did not speak to the period after 2009, and
that Dr. Figueroa's 2015 report was internally inconsistent (*see* Background, *supra*, at
Section B(4)(c); *see also* R. at 421 (ALJ's discounting of Dr. Figueroa's opinion for that
reason))) – raises another problem with the ALJ's conduct in this case, *i.e.*, that he failed to take
adequate steps to develop the Record.  Accordingly, if this case were to be remanded for further
consideration by the ALJ, then I would recommend that the ALJ be directed to seek medical
source statements from any medical providers (not merely Dr. Thompson) who diagnosed and
treated Plaintiff for his physical impairments, during the period relevant to his benefits claims.
*See, e.g.*, *Hooper v. Colvin*, No. 15cv6646 (JLC), 2016 WL 4154701, at *14-15 (S.D.N.Y. Aug.
5, 2016) (ordering remand where "the ALJ made [the plaintiff's] disability determination based
on a record devoid of any truly complete medical opinion" and there was no "up-to-date medical
opinion assessing [the plaintiff's] functional limitations").

[36] Plaintiff's counsel also asserts that the ALJ committed legal error by failing to address
each of the credibility factors set forth in SSA regulations, *see* 20 C.F.R. §§ 404.1529(c)(3)(i)-
(vii), 416.929(c)(3)(i)-(vii).  (Pl. Mem., at 23.)  An ALJ is not, however, required to discuss each

Upon a review of the transcript of the February 3, 2015 hearing, and upon consideration of the evidence in the Record pertaining to Plaintiff's cognitive limitations, this Court finds that the ALJ's assertion that Plaintiff "attempted to conceal his off the books work as a pizza delivery driver" (R. at 414) is not well-founded.  At the hearing, when the ALJ asked if Plaintiff "worked" at Napoli's the prior day, Plaintiff corrected him by stating, "I don't get paid.  I get my meals [from Napoli's]."  (*Id.* at 516.)  Plaintiff also testified that he views his deliveries as "helping [the Napoli's owner] out" in exchange for food.  (*Id.* at 517.)  Further, when the ALJ asked if Plaintiff ever reported to "social services that [he] [was] earning tip money from delivering [for Napoli's]," Plaintiff responded that he "didn't realize he had to."  (*Id.* at 519.) Additionally, when questioned by his attorney as to whether he went to Napoli's to eat or do deliveries, Plaintiff replied that he went there "[t]o eat sometimes," and that he also went there when he had nothing else to do.  (*Id.* at 526.)  This testimony is consistent with the affidavit of Napoli's owner, Siderias, who stated that he allowed Plaintiff to sit in his restaurant because Plaintiff "ha[d] nowhere else to go," and that he allowed Plaintiff to do short local deliveries "in exchange for either food or the tips he receive[d] from the customer."  (*Id.* at 713.)  Given the ALJ's apparent decision to disregard Plaintiff's special education background, the reports of Drs. Aftab and Helprin regarding Plaintiff's cognitive limitations, and the results of Plaintiff's IQ tests, the ALJ's decision to disbelieve Plaintiff's testimony and instead conclude that Plaintiff intended to deceive the SSA by working "off-the-books" is not supported by substantial evidence.

---

of the credibility factors explicitly, so long as his or her decision "'includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasoning for that weight.'"  *Simmons v. Comm'r of Soc. Sec.*, 103 F. Supp. 3d 547, 569 (S.D.N.Y. 2015) (quoting *Felix v. Astrue*, No. 11cv3697 (KAM), 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012)).

Moreover, despite repeatedly referencing Plaintiff's pizza deliveries as a basis for

discrediting Plaintiff's subjective complaints and the opinions of Drs. Helprin, Mata, Aftab,

Thompson, and Figueroa (*id.* at 415-17, 420-21), the ALJ failed to explain with any degree of

specificity how such occasional deliveries were inconsistent with a disability finding.

*Cf. Balsamo*, 142 F.3d at 81 ("We have stated on numerous occasions that 'a claimant need not

be an invalid to be found disabled' under the [Act]." (citation omitted)); *Carroll v. Sec. of Health*

*& Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983) (finding that the plaintiff's testimony

regarding certain daily activities did not support the ALJ's conclusion that the plaintiff could

engage in sedentary work because "[t]here was no proof that [the plaintiff] engaged in any of

th[o]se activities for sustained periods comparable to those required to hold a sedentary job").

There is nothing in the Record to suggest that Plaintiff delivered pizzas for Napoli's on anywhere

near a full-time or sustained basis.  To the contrary, while Plaintiff testified that he visited

Napoli's every day (*id.* at 517-19), he further testified that he only made deliveries on two or

three days per week (*id.* at 525), and, on those days, he made only "maybe" $15 in tips per day,

on only two or three deliveries (*id.* at 517-18).[37]  Moreover, the owner of Napoli's attested by

affidavit that Plaintiff only made deliveries for his restaurant "[o]n occasion," that those

deliveries were "short" and "local," and that Plaintiff "d[id] not do multiple deliveries at one

time."  (*Id.* at 713.)  The rest of the time that Plaintiff was at Napoli's, it appears that he just sat

and ate the food that was given to him.  (*Id.*; *see also id.* at 526.)  Although a vocational expert

---

[37] After Plaintiff testified that he made "$15.00 maybe" in tips per day at Napoli's, the
ALJ asked how much in tips Plaintiff made per week.  (*Id.* at 518.)  In response, Plaintiff said
"$75.00."  (*Id.*)  Given Plaintiff's other testimony that he only made deliveries two or three days
per week (*id.* at 525), it appears that Plaintiff may have made a computation error in stating that
he made $75.00 in tips per week.  In this regard, Plaintiff's cognitive limitations are well-
documented, and it may be worth noting that, at a prior hearing, Plaintiff was unable to recall or
compute his age, even after the ALJ told him his birthdate.  (*Id.* at 440.)

testified that the job of "pizza deliverer" constitutes "medium" work (*id.* at 529), there is nothing in the Record indicating that what Plaintiff did for Napoli's was comparable to the work of someone actually employed full-time as a pizza-delivery worker.  Accordingly, while it would have been entirely appropriate for the ALJ to consider, as part of his credibility determination, the fact that Plaintiff was able to handle a modest number of pizza deliveries per week, the ALJ erred in discounting Plaintiff's credibility as significantly as he did, based on the character of the evidence on this point.

The ALJ's other stated reasons for making an adverse finding as to Plaintiff's credibility are also unpersuasive.  Besides placing undue weight on Plaintiff's pizza deliveries, the ALJ also discounted Plaintiff's credibility on the ground that his other daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  (*Id.* at 421.)  As discussed above, however, the ALJ largely overstated the extent of many of Plaintiff's daily activities.  In addition, the ALJ had no basis for placing any kind of significant reliance on Plaintiff's supposed "daily activities" of having taken care of his mother, who suffered from cancer, and on his having "organiz[ed] a fundraiser."  (*Id.* at 422.)  As to Plaintiff's ailing mother, who died in January 2009, there is no evidence in the Record regarding what Plaintiff actually did to care for her, except for his vague testimony that he "took care of her" and took her to "treatments" in 2008 (and not any other year during the relevant time period).  (*Id.* at 488-89.)  With respect to the fundraiser, the full extent of the evidence in the Record relating to any fundraiser is in the form of two brief and ambiguous treatment notes written by Plaintiff's therapist, Bachenheimer.  (*See id.* at 360, 369.)  In one note, Bachenheimer wrote that, on October 23, 2009, Plaintiff had "spoke[n] about the opportunity to run this fundraiser[, which] did not go off too well and he's a little disappointed."  (*Id.* at 360.)  In the

second note, Bachenheimer also reported that, on August 27, 2010, he and Plaintiff "spoke about how [Plaintiff] would like to try to do a fundraiser[,] which is something he had done last year." (*Id.* at 369.) There is no evidence regarding what organizing the fundraiser entailed. Nor is there any suggestion in these treatment notes that Plaintiff's actions in organizing this fundraiser were somehow inconsistent with his claims that his physical and mental impairments were disabling.

Thus, this Court concludes that, absent additional information, it was error for the ALJ to have discredited Plaintiff's complaints of impairments based on these and other more mundane daily activities that Plaintiff performed. *See Cullen*, 2016 WL 3144050, at *7-8 (holding that, in misconstruing the plaintiff's testimony and "devot[ing] significant attention to the plaintiff's description of his daily activities," such as cooking, cleaning, shopping, walking for short periods, handling his personal finances, and watching television, the ALJ "fail[ed] to provide a legitimate basis for rejecting the plaintiff's statements concerning his inability to get through a regular work day"); *Bradley v. Colvin*, 100 F. Supp. 3d 429, 446 (E.D.N.Y. 2015) ("While [the plaintiff] did engage in the daily activities of raising two children, driving an SUV locally, exercising periodically and performing some household duties with the help of her son . . . , such conduct does not show that [the plaintiff] is capable of performing full time light work."); *Bialek v. Astrue*, No. 11cv5220 (FB), 2013 WL 316165, at *4 (E.D.N.Y. Jan. 28, 2013) ("Although daily activities are a relevant consideration, . . . , [the plaintiff's] ability to tend to his personal needs and travel to appointments is not indicative of his ability to perform light work" and was therefore "an improper basis for discounting [the plaintiff's] subjective complaints"); *Martin v. Astrue*, No. 07cv3911 (LAP), 2009 WL 2356118, at *12 (S.D.N.Y. July 30, 2009) ("The mundane tasks of life performed by [the plaintiff] do not indicate that he is able to perform a full day of sedentary work." (collecting cases)).

Finally, it appears that the ALJ erred by characterizing Plaintiff's psychiatric and medical treatment history as "conservative," and then using that characterization as another basis to discredit Plaintiff's subjective complaints.  (R. at 422-23.)  While Plaintiff's treatment for his physical impairments might qualify as routine or conservative, *see Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("The fact that a patient takes only over-the-counter medicine to alleviate her pain may . . . help support the Commissioner's conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record"), the same cannot be said for his treatment for his mental impairments.  Plaintiff saw a psychiatrist, Dr. Aftab, continuously from September 2009 through at least January 2015.  (R. at 375-83, 895, 923-35, 1949-50.)  Moreover, Dr. Aftab prescribed Plaintiff at least nine different psychotropic drugs over this time period.  (*Id.* at 375-76, 895, 923-26; *see also id.* at 908-09, 1127.)  Plaintiff also saw Bachenheimer, a therapist, on a weekly basis from at least September 2009 to September 2010 and July 2013 to November 2014.  (*Id.* at 358-70, 1136-49.)  Additionally, Plaintiff was seen in a hospital emergency department for an unspecified psychiatric issue in August 2009.  (*Id.* at 260-63.)  Courts have found similar psychiatric courses of treatment not to be conservative.  *See, e.g.*, *Carden v. Colvin*, No. CV 13-3856-E, 2014 WL 839111, at *2-3 (C.D. Cal. Mar. 4, 2014) (finding that the ALJ mischaracterized the plaintiff's psychiatric treatment as "conservative" where, although the plaintiff had not been hospitalized, he had been under the "continuous care of mental health professionals, including psychiatrists, clinical pharmacists, and psychiatric social workers" for several years, had attended "frequent therapy sessions," and was prescribed psychotropic medications).[38]

_____

[38] *See also Wilson v. Colvin*, No. 8:15cv4185 (MGL) (JDA), 2016 WL 6471904, at *15 (D.S.C. Oct. 19, 2016) (finding that the ALJ erred in characterizing the plaintiff's mental health treatment as "conservative" where the plaintiff had received mental health treatment for several

Accordingly, if remand for reconsideration of the ALJ's benefits determination were ordered, then this Court would recommend that, upon remand, the ALJ be directed to reconsider his assessment of Plaintiff's credibility, in light of the issues discussed above.

## CONCLUSION

For all of the foregoing reasons, this Court recommends that the Commissioner's motion for judgment on the pleadings (Dkt. 15) be denied, and that Plaintiff's cross-motion for judgment on the pleadings (Dkt. 19) be granted, <u>with an order remanding this case solely for the calculation and payment of benefits to Plaintiff on the ground that he has been disabled under Listing 12.05C since his alleged onset date of December 31, 2007</u>.

Should the Court adopt this recommendation, then no further issues need be reached. If, however, the Court were to determine that remand solely for the calculation of benefits would not be appropriate, then I would alternatively recommend that Plaintiff's cross-motion be granted to the extent of ordering remand to the ALJ for reconsideration of his denial of benefits. In the event of such a remand, the ALJ should be specifically directed to reconsider his determination, at step three, that Plaintiff did not meet Listing 12.05C; to reweigh the opinions of Plaintiff's psychiatric treaters and consultants, in accordance with the treating physician rule; to take further steps to develop the Record, so as to obtain opinions from treating sources regarding Plaintiff's physical impairments during the full period under review; and to reconsider Plaintiff's credibility in a manner that addresses the issues raised in this Report and Recommendation.

---

years and had been prescribed psychotropic medications during that time period), *report and recommendation adopted*, 2016 WL 643350 (Oct. 31, 2016); *Mason v. Colvin*, No. 1:12cv584 (GSA), 2013 WL 5278932, at *6 (E.D. Cal. Sept. 18, 2013) (finding that the plaintiff "did not receive conservative treatment" where she was prescribed antidepressants and antipsychotic medications and received mental health treatment by a psychiatrist and psychiatric social worker "for a continuous fourteen month period").

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail).

Such objections, and any responses to objections, shall be filed with the Clerk of Court, with

courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, United States

Courthouse, 500 Pearl St., Room 1020, New York, New York 10007, and to the chambers of the

undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York

10007. Any requests for an extension of time for filing objections must be directed to

Judge Castel. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL

RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW.

*See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d

Cir. 1983).

Dated:  New York, New York
      March 1, 2017

                              Respectfully submitted,

                              DEBRA FREEMAN
                              United States Magistrate Judge

Copies to:

Hon. P. Kevin Castel, U.S.D.J.

All counsel (via ECF)